IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


THOMAS BURLINGTON                          :
                                           :          CIVIL ACTION
            v.                             :
                                           :          NO. 09-1908
NEWS CORPORATION,                          :
                                           :
FOX TELEVISION STATIONS, INC., and         :
                                           :
FOX TELEVISION STATIONS OF                 :
PHILADELPHIA, INC.                         :


**SURRICK, J.**                                          **DECEMBER 23, 2010**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 26.)

For the following reasons, the Motion will be granted in part and denied in part.

**I.     BACKGROUND**

On May 4, 2009, Plaintiff Thomas Burlington filed suit against Defendants News

Corporation, Fox Television Stations, Inc., and Fox Television Stations of Philadelphia, Inc.

alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, 28

U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et*

*seq.*  Plaintiff is a white male.  He alleges that he was discriminated against because of his race,

was subjected to a hostile work environment, and that Defendants retaliated against him.

(Compl. ¶¶ 56-72, ECF No. 1.)  Defendant News Corporation was dismissed from this litigation

by stipulation of the parties.  (*See* Stipulation of Dismissal, ECF No. 27.)  The remaining

defendants are Fox Television Stations, Inc., and Fox Television Stations of Philadelphia, Inc.

(collectively "the Station," "Fox," or "Defendants").

Plaintiff was hired by Defendants as a reporter in December 2004. (Pl.'s Dep. 146:16-20, Pl.'s Resp. Ex. A, ECF No. 28.) Plaintiff received a B.S. in Journalism from the University of Colorado in 1984 and an M.A. from Wake Forest University in 1994. (Pl.'s Resp. Ex. B at 1.) He had 17 years of experience as a reporter or anchor when he was hired by Defendants. (*Id.*) Plaintiff has won several awards for his reporting, including the Edward R. Murrow Award. (*Id.*) His written evaluations while an employee at the Station rate him as a "Solid Performer." (*See* Pl.'s Resp. Ex. F, Ex. G (two evaluations rating Plaintiff a "3 - Solid Performer" on a 1 to 5 scale).) Plaintiff was promoted to weekend anchor/reporter on February 20, 2006. (Pl.'s Resp. Ex. H.) Joyce Evans, an African American female, was Plaintiff's weekend co-anchor. (Pl.'s Dep. 148:16-17.)

The Station regularly held newsroom editorial meetings in which its journalists discussed the stories that would air on that evening's news broadcast. (Renda Dep. 95:23-96:8, Pl.'s Resp. Ex. J.) Plaintiff claims that he suffered reverse discrimination as a result of a comment that he made at a newsroom editorial meeting on June 23, 2007. Plaintiff attended the June 23rd newsroom editorial meeting along with eight of his coworkers. The individuals who attended the meeting and their races are as follows:

- Plaintiff—White
- Christopher Denton—White
- Cynthia Cappello—White
- Charles Edmondson—White
- John Jervay—African American
- Rebecca Rogers—White
- Tor Smith—African America
- Robin Taylor—White
- Nicole Wolfe—African American

(Pl.'s Resp. Ex. O at 7-8.) During the June 23rd meeting, the group discussed a story about the

Philadelphia Youth Council of the NAACP holding a symbolic burial for the word "nigger." (Pl.'s Dep. 161:13-19.) Robin Taylor had been assigned to the story. (Taylor Dep. 63:4-8, Pl.'s Resp. Ex. N.) Taylor had attended the symbolic burial and testified that the participants at the burial used the word "at least a hundred times or more" during the course of the proceedings. (*Id.* at 65:9-13.) Taylor discussed the story with her colleagues at the editorial meeting and consistently referred to the racial slur as "the n-word" instead of using the full word. (Taylor Dep. 80:21-81:4.) During the meeting Plaintiff asked, "Does this mean we can finally say the word 'nigger?'" (Pl.'s Dep. 162:3-4.) Taylor said that she would not say the word in her story. (*Id.* at 163:16-22.) Plaintiff told Taylor that although he did not necessarily expect her to use the word in her story, he thought that doing so gave the story more credence. (Taylor Dep. 82:20-83:10.) At his deposition Plaintiff testified that he "wanted to make the point that I felt if we're going to refer to the word 'nigger,' we should either say the word 'nigger' or refer to it as a racial epithet or a slur instead of using the phrase the 'N' word." (Pl.'s Dep. 161:20-24.) Plaintiff used the word once during the newsroom meeting. (*Id.* at 165:17-21; Taylor Dep. 87:12-14.) Nicole Wolfe exclaimed in response to Plaintiff's use of the word, "I can't believe you just said that!" (Pl.'s Dep. 182:15-18; Tyler Dep. 16:14-18, Pl.'s Resp. Ex. K.) Neither Plaintiff nor Taylor recalls anyone else saying anything on this subject during the meeting. (Pl.'s Dep. 163:23-24; Taylor Dep. 85:6-10.)

After the discussion about whether to use the word, the meeting proceeded as normal, though Plaintiff noticed that his comments had elicited a negative reaction from Nicole Wolfe. (Pl.'s Dep. 163:2-164:10.) Wolfe later told Taylor that she was offended by Plaintiff's use of the racial slur during the meeting. (Taylor Dep. 88:8-18.) Nobody at the meeting believed that Plaintiff used the word in its pejorative sense as a racial slur. (*See, e.g.*, Ali Dep. 104:20-105:1,

Pl.'s Resp. Ex. I.) Taylor later told the head of human resources, Ameena Ali, that she thought more was being made of the situation than should be, and that Plaintiff had not acted maliciously in making his statements during the meeting. (*Id.* at 210:23-211:5.)

After the meeting, Plaintiff approached Wolfe and said that he had sensed that she was upset and "wanted to explain." (Pl.'s Dep. 166:18-23.) Wolfe said that she did not want to discuss the meeting. (*Id.* at 167:2-8.) Soon thereafter, Plaintiff was confronted by his co-anchor, Joyce Evans, who was not present at the meeting but had been approached by several meeting attendees who had been offended by Plaintiff's remarks. Evans is African American. (Tyler Dep. 15:8-18; Evans Dep. 68:19-23, Pl.'s Resp. Ex. W.) Evans informed Plaintiff that he had upset his coworkers, and Plaintiff decided to talk to each of the attendees individually. (Pl.'s Dep. 174.) Plaintiff spoke to John Jervay and explained his rationale for using the word during the meeting. Jervay perceived this to be "some form of an apology." (Jervay Dep 39:17-18, Def.'s Mot. Ex. 14, ECF No. 26-5.) During the conversation with Jervay, Plaintiff again used the word once or twice. (*Id.* at 39:1-18.) Plaintiff had similar conversations with Christopher Denton, Cynthia Cappello, Charles Edmondson, and Tor Smith. (Pl.'s Dep. 177:12-19.) As with Jervay, Plaintiff used the word in several (though not all) of these conversations. (*See, e.g.*, *id.* at 172:25-173:9, 185:6-14.) After he explained himself and apologized to his coworkers, Plaintiff again spoke to Evans. (Pl.'s Dep. 187:14-19.) Plaintiff testified that during this conversation, "Joyce said, [b]ecause you're white you can never understand what it's like to be called a nigger and that you cannot use the word 'nigger.'" (Pl.'s Dep. 188:18-23.) Evans denies telling Plaintiff that he could not say the word because he was white, and she also denies ever saying the word during her conversation with Plaintiff. (Evans Dep. 18:9-20.) Plaintiff testified that Evans used the word twice in their conversation. (Pl.'s Dep. 157:6-8.) Plaintiff told Evans that he was surprised at her

position, because he did not believe that a journalist was not allowed to say certain words in an editorial context.[1]  (*Id.* at 188:4-189:4.)

The conversation ended with Evans and Plaintiff in full disagreement.  (*Id.* at 193:21-22.)  Thereafter, Plaintiff overheard Evans telling another employee that "people get fired for using that word."  (*Id.* at 194:2-6.)  Plaintiff testified that at that point, he realized that "she was not letting this go."  (*Id.* at 194:6-7.)  On Sunday, June 24, Evans called the Assistant News Director, Leslie Tyler, at home to tell her about Plaintiff's actions at the previous day's newsroom editorial meeting.  Tyler is African American.  (Tyler Dep. 14:17-15:21, Pl.'s Resp. Ex. K, ECF No. 28.)  Evans told Tyler that employees were upset over what Plaintiff had said during the meeting.  (*Id.* at 15:8-18.)  Evans felt that Tyler should know what had happened in the meeting and how people reacted to it.  (*Id.*)  Tyler called several employees that day to find out what had happened in the meeting.  (*Id.* at 21:14-16.)  Tyler testified that she believes that she called Nicole Wolfe, John Jervay, Tor Smith, Becky Rogers and Robin Taylor.  (*Id.*)  Plaintiff contends based on Taylor's and Rogers's deposition testimony that Tyler only called the African American employees who were present at the meeting.[2]  (Pl.'s Resp. 16-17.)  Defendants dispute this, pointing out that Tyler and/or Ali eventually spoke to Christopher Denton, who is white, and several other white employees who attended the meeting.  (Def.'s Reply 29-30.)  In any event, the record shows that

---

[1]   Ameena Ali, the head of Defendants' HR department, testified in her deposition that Evans's statement that white people could not say the word would be a violation of Defendants' EEO policies.  (Ali Dep. 109:11-110:3.)

[2] Becky Rogers stated in her deposition that she first spoke to Tyler about the incident in Tyler's office later in the week—not on the phone on Sunday, June 24, as Tyler testified.  (*See* Rogers Dep. 90:7-20, Pl.'s Resp. Ex. L, ECF No. 28.)  Similarly, Robin Taylor testified that she did not talk to anyone about the incident until "days later.  Probably a week later."  (Taylor Dep. 90:21-25.)  This contradicts Tyler's testimony that she called Taylor on Sunday, June 24.  We must not resolve factual issues, but we must view the facts and the inferences in the light most favorable to the Plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

on Sunday, June 24, 2007, Tyler called all the African American employees who had been present at the meeting but had not called the majority of the white attendees, including Plaintiff himself.

On Monday, June 25, Tyler spoke to the News Director at the Station, Philip Metlin, about the June 23 meeting and its aftermath. Metlin is a white male. (Tyler Dep. 26:23-27:18.) Tyler had intended to inform Ameena Ali about the situation, but Metlin told Tyler not to contact Ali or to do anything else at that juncture. (*Id.* at 28:6-12, 31:4-17.) Over the following few days, Tyler received emails from several of the people whom she had called the previous Sunday. Tor Smith sent an email to Tyler and Metlin on Wednesday, June 27. (Smith Dep. 24:16-17, Pl.'s Resp. Ex. T.) Joyce Evans had recommended that Smith speak to Tyler about his discomfort with Plaintiff's comments. Tyler in turn recommended that Smith detail his complaint about Plaintiff in an email to Tyler and Metlin. (*Id.* at 31:1-24.) Smith's email details his version of Plaintiff's remarks during and after the June 23 meeting. (Def.'s Mot. Ex. 16, ECF No. 26-6.) Nicole Wolfe also wrote an email to Metlin and Tyler, as did Becky Rogers. (*Id.* Ex. 17; Ali Dep. 200:22-201:8.) In addition, John Jervay sent an email describing Plaintiff's actions to Metlin and Tyler. Jervay's email explicitly uses the word "nigger" three times, twice in all capital letters. (Def.'s Mot. Ex. 18, ECF No. 26-6.)

Becky Rogers wrote her email to Metlin and Tyler after a conversation with Joyce Evans in which Evans asked Rogers how she felt about Plaintiff's behavior at the meeting. Rogers said that she was "horrified." (Rogers Dep. 102:23-103:3.) Evans said that it was important that Rogers let management know how she felt because "[t]he only people who have complained so far have been black people." (*Id.* at 103:6-16.) Rogers said that she would think about it. (*Id.* at 104:14-16.)

At this point, Metlin brought the issue to Mike Renda, the General Manager of the station.

Renda is a white male. (Renda Dep. 20:7-21:11, Pl.'s Resp. Ex. J, ECF No. 28.) Renda ordered Ameena Ali to conduct an investigation into Plaintiff's actions. (*Id.* at 21:14-24:7.) As part of that investigation, Ali asked Plaintiff to participate in a meeting with her, Metlin, and Renda on June 29, 2007. (Def.'s Mot. Ex. 24.) During the meeting, Metlin asked Plaintiff to give his version of the events at the editorial meeting the previous Saturday. (*Id.*) Plaintiff recited what he had said in the editorial meeting, using the word in the process. (*Id.*; Ali Dep. 146:14-147:13.) Ali responded, "Tom, you're still saying the word, why are you doing that?" (Ali Dep. 148:21-149:3; *see also* Pl.'s Dep. 214:14-23 ("Ms. Ali cut me off and said, 'I can't believe you said it again. . . . Don't you know you can't use that word?'").) Plaintiff replied that he was simply relating what had happened at the editorial meeting, as Metlin had requested. (Pl.'s Dep. 214:25-215:3.) Ali testified that she found Plaintiff's use of the word during the meeting offensive. (Ali Dep. 149:12-15.) Metlin, who is Jewish, explained to Plaintiff that his use of the word was akin to calling someone a "kike." (Metlin Dep. 155:7-20.) Metlin told Plaintiff that he would be suspended pending an investigation, and the meeting ended abruptly. (Pl.'s Dep. 216:17-19.) The entire meeting lasted about five minutes. (*Id.* at 214:11.) Plaintiff did not have an opportunity to give his version of the events that occurred after the editorial meeting, including his apologies to coworkers. (*Id.* at 213:15-20.)

Plaintiff was never asked to explain his side of the story during the subsequent investigation. (Ali Dep. 185:16-187:3.) Plaintiff emailed Metlin on June 30 requesting an "opportunity to allow you to assess my sincerity by speaking with you face-to-face so you can hear what is in my head and in my heart." (Pl.'s Resp. Ex. EE.) Plaintiff never received a response from Metlin. (Pl.'s Resp. Ex. X at 5.) As part of the investigation, Ali spoke to Cyndi

Cappello, Nicole Wolfe, and Robin Taylor.[3]  (Ali Dep. 212:22-213:13.)  Ali did not speak to

Plaintiff during the course of the investigation.  (*Id.* at 185:16-187:4.)  Nor did Ali inquire as to

whether the employees who had attended the June 23rd editorial meeting had reacted to Plaintiff's

comments the way they did because of Plaintiff's race.  (*Id.* at 108:23-109:6.)

The investigation concluded on July 3, 2007.  (Pl.'s Resp. Ex. JJ.)  Plaintiff was issued a

memorandum entitled "Final Warning and Employee Assistance Program Referral."  (*See id.*)

The memorandum briefly described the events that had led to Plaintiff's suspension and informed

Plaintiff that "[y]our behavior was unacceptable and will not be tolerated.  You will not be

warned again.  Further failure to meet the job performance standards of your position will result

in the immediate termination of your employment."  (*Id.*)  It referred Plaintiff to sensitivity

training and stated that Plaintiff's failure to contact the Employee Assistance Program ("EAP") to

schedule the sensitivity training, or to follow its recommendations, would be interpreted as a

refusal to cooperate.  (*Id.*)  According to Plaintiff, Mike Renda told Plaintiff at about this time

that they were "going to ride this one out," and that Plaintiff would be reinstated if he complied

with the EAP's requirements.  (Pl.'s Dep. 224:4-7.)  Phil Metlin testified that at this point

Defendants had most likely not yet decided to terminate Plaintiff, as they would not have given a

final warning to an employee whom they had decided to terminate.  (Metlin Dep. 259:5-8.)

On July 5, 2007, the Philadelphia Daily News published an article about Plaintiff's

suspension in which it stated that "FOX 29 anchor/reporter Tom Burlington has been suspended

by the station following what sources describe as a 'bizarre' and 'shocking' sermon in which he

insisted there's nothing wrong with a word most commonly referred to as 'the N-word.'"  Dan

---

[3] Ali's testimony that she spoke with Robin Taylor as part of her investigation is in conflict with Taylor's testimony that Ali did not speak to her.  (*Compare* Ali Dep. 212:22-213:13, *with* Taylor Dep. 106:9-12.)

Gross, *Fox's Tom Burlington suspended*, Phila. Daily News, July 5, 2007. The article stated that Plaintiff had "used the word more than a dozen times as he argued that doing so was not such a big deal." *Id.* Plaintiff called the article "false and defamatory" and suggested that the source of the Daily News's information was a coworker who wanted to end Plaintiff's career. (Pl.'s Resp. Ex. X at 4; Pl.'s Dep. 264:2-8.) The Philadelphia Tribune picked up the story the following day, running a front-page article with Plaintiff's picture. Larry Miller, *Fox news anchor suspended—reports say journalist used the 'n-word'*, Phila. Trib., July 6, 2007, at 1A. The story was subsequently picked up by several other print and online media outlets. (*See generally* Def.'s Mot. 13 (citing news articles).)

The Daily News article attributes its information about the June 23 editorial meeting to Plaintiff's colleagues at the Station. *See* Gross, *supra*. Phil Metlin acknowledged that leaking information about the editorial meeting would be a violation of the Station's policies. (Metlin Dep. 180:2-6.) Mike Renda testified that if he learned of a Station employee leaking this story to the press, the employee most likely would have been terminated. (Renda Dep. 77:10-78:24.) The Station did not conduct an investigation to determine whether one of its employees had leaked the story to the media. (Renda Dep. 85:4-10.)

The Station's management began to receive requests from employees that they not be assigned to work with Plaintiff. Photographer Paxton Reese emailed Chief Photographer John Campbell with a request that he not be assigned to work with Plaintiff. (Defs.' Mot. Ex. 27.) Paxton Reese is African American. Mike Renda testified that other photographers requested that they not be assigned to work with Plaintiff because they were concerned for their safety if they appeared on the street with Plaintiff. (Renda Dep. 172:21-173:6.)

In the meantime, Plaintiff complied with the EAP's requirements. (Ali Dep. 249:6-20.)

On July 6, 2007, the EAP informed Ali that Plaintiff was fit to return to work. (*See* Pl.'s Resp. Ex. MM (stating that Plaintiff was "in compliance" and was fit to return to work, and that "[h]e feels very badly and is remorseful about what happened").) Ali forwarded the email to Mike Renda. (*See id.*) On July 9th, Renda replied to Ali's email, stating, "[w]e need to talk about return scenario—news would like him to return Wed." (Pl.'s Resp. Ex. NN.)

Joyce Evans called Ameena Ali on July 10th to inform her that she was receiving phone calls from the National Association of Black Journalists ("NABJ") and the Philadelphia Association of Black Journalists ("PABJ") regarding Plaintiff's behavior at the editorial meeting. (Pl.'s Resp. Ex. OO.) Evans also told Ali that she was hearing a lot of comments from "people talking to [her] on the street" about Plaintiff's use of the word during and after the editorial meeting. (Evans Dep. 138:18-21.) Evans testified that she received a lot of phone calls asking if she was okay, as well as a voicemail from the NABJ and a voicemail from the PABJ. (*Id.* at 137:13-138:21.) Evans did not actually talk to anyone at the NABJ or the PABJ, and she could not provide the name of anyone who had spoken to her regarding Plaintiff's behavior. (*Id.* at 137:7-140:12.) Ali testified that she believed Evans had called her to ask for advice on how to respond to these inquiries. (Ali Dep. 301:10-18.) Evans also told Ali that she was concerned about her on-air chemistry with Plaintiff in light of Plaintiff's actions. (*Id.* at 301:19-21.) Ali testified that she did not believe that Evans was trying to prevent Plaintiff from returning to work. (*Id.* at 302:23-303:5.) Upon viewing Ali's notes from the phone call with Evans, which read, "Getting lots of calls / NABJ / PABJ / People on street / Was concerned about the chemistry if Tom comes back," Phil Metlin agreed that there was a racial issue regarding Plaintiff's comments. (Metlin Dep. 255:10-14 ("Q: As you read [Ali's notes], is this document indicating to you that there's a racial issue concerning Mr. Burlington's comments? A: Yes.").)

On July 12, 2007, Mike Renda, Ameena Ali, and Phil Metlin met with Plaintiff and informed him that he would not be put back on the air, and that his contract would not be renewed when it expired. (Pl.'s Dep. 244:23-245:6.) Renda testified that the Station could have fired Plaintiff for cause, stating that the adverse publicity resulting from Plaintiff's behavior violated the clause in Plaintiff's contract that prevented him from engaging in "any activity that may result in adverse publicity or notoriety for performer or company." (Renda Dep. 199:1-5.) Nevertheless, Renda offered Plaintiff the opportunity to resign, believing it to be the right thing to do. (*Id.* at 195:18-196:2.) Plaintiff told Renda, Metlin, and Ali that it would ruin his career if they terminated him, but Metlin assured Plaintiff that he would "come through this without any problems." (Pl.'s Dep. 245:20-246:5.) Renda explained that their concern for Plaintiff's safety was the basis for his decision. Plaintiff was unable to elicit any further explanation. (*Id.* at 245:9-19.) No one stated that Plaintiff's race was the reason for his termination, and Plaintiff did not suggest as much during the meeting. (*Id.* at 248:2-12.) Plaintiff never returned to work at the Station, though the Station paid Plaintiff through the end of his contract, which expired on February 19, 2008. (*Id.* at 247:18-25, 64:21-65:1.) Since his contract with Fox expired, Plaintiff has been unable to obtain a job as a journalist. (*Id.* at 100:14-23.) He is currently working as a real-estate agent. (*Id.* at 33:20-21.)

## II.      LEGAL STANDARD

A party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). Where the nonmoving

party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party may not avoid summary judgment by relying on speculation or by rehashing the allegations in the pleadings. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "We must construe the evidence in favor of the non-moving party, and summary judgment must be denied if there exists enough evidence 'to enable a jury to reasonably find for the nonmovant on the issue.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 (3d Cir. 2009) (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)).

## III. ANALYSIS

Plaintiff asserts claims for discrimination, hostile work environment, and retaliation in violation of Title VII, the PHRA, and 28 U.S.C. § 1981. The standards for analyzing Plaintiff's Title VII, PHRA, and § 1981 claims are the same for purposes of this summary-judgment Motion. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). Plaintiff has withdrawn his

retaliation claim. (*See* Pl.'s Resp. 47 n.299.) Therefore, we need only address his claims of discrimination and hostile work environment.

## A.    Title VII—Discrimination

Plaintiff alleges that his termination was based on his race in violation of Title VII, the PHRA, and § 1981. (*See* Compl. ¶¶ 57-72.) Generally, courts analyze discrimination claims in which direct evidence of discrimination is lacking under the *McDonnell Douglas* burden-shifting paradigm. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff suggests that we proceed under the mixed-motive analysis that was introduced by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244 (1989), and codified by Congress with some modification in the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m). (Pl.'s Resp. 44-45; *see also* Compl. ¶¶ 48-49.) Section 2000e-2(m) states that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." The Supreme Court found in *Desert Palace, Inc. v. Costa* that a Plaintiff who lacks direct evidence of discrimination can nevertheless proceed on a mixed-motive theory. 539 U.S. 90, 101-02 (2003).

The Third Circuit has not definitively addressed the relationship between the *McDonnell Douglas* analysis and the mixed-motive analysis of § 2000e-2(m). In *Makky v. Chertoff* the Third Circuit stated that "[t]he *McDonnell Douglas* burden-shifting framework does not apply in a mixed-motive case in the way it does in a pretext case because the issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played 'a motivating part' in an employment decision." 541 F.3d 205, 214 (3d Cir. 2008). The Third Circuit declined to address whether a plaintiff proceeding on a mixed-motive theory must first establish a prima

facie case of discrimination as in *McDonnell Douglas*. The Court of Appeals decided only that a plaintiff proceeding on a mixed-motive theory must first prove that he or she was qualified for the position. *Id.* at 215.

Circuit courts have differed in their approaches to the mixed-motive analysis in light of *Desert Palace*. The Fifth Circuit has modified the *McDonnell Douglas* analysis such that the third prong now permits plaintiffs to show not only that the defendant's nondiscriminatory reasons are pretextual, but also "that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). The Eighth Circuit, by contrast, has found that *Desert Palace* has no effect on the *McDonnell Douglas* analysis at the summary-judgment stage. *See Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004) ("At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment. Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues."). The Ninth Circuit has analyzed mixed-motive cases under both the traditional *McDonnell Douglas* burden-shifting analysis and the mixed-motive analysis. *See, e.g.*, *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1068 (9th Cir. 2003) ("We analyze Stegall's case as both a pretext case and a mixed motives case, and find that her case survives summary judgment under either theory."). This approach has been followed by several courts in this district as well. *See, e.g.*, *Young v. St. James Mgmt, LLC*, __ F. Supp. 2d __, 2010 WL 4290165, at *11 (E.D. Pa. Oct. 29, 2010) (analyzing summary-judgment motion under both mixed-motive and *McDonnell*

*Douglas* approach); *Hartwell v. Lifetime Doors, Inc.*, No. 05-2115, 2006 WL 381685, at *5 (E.D. Pa. Feb. 16, 2006) (same); *Campetti v. Career Educ. Corp.*, No. 02-1349, 2003 WL 21961438, at *7 (E.D. Pa. June 25, 2003) (same). We will address Plaintiff's claims using both the *McDonnell Douglas* analysis and mixed-motive analysis.

### 1. *McDonnell Douglas Burden-Shifting Analysis*

The *McDonnell Douglas* analysis has three parts. First, Plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam) (citations omitted). If he succeeds, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802) (internal quotation marks omitted). If Defendants meet this burden, Plaintiff must establish by a preponderance of the evidence that Defendants' proffered reasons are a pretext for discrimination. *Id.* (citations omitted).

### (i) Plaintiff's prima facie case

To establish a prima facie case of discrimination, a plaintiff generally must demonstrate by a preponderance of the evidence that "(1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) . . . circumstances that raise an inference of discriminatory action . . . ." *Warenecki v. City of Phila.*, No. 10-1450, 2010 WL 4344558, at *5 (E.D. Pa. Nov. 3, 2010) (citing *Sarullo*, 352 F.3d at 797) (ellipses in the original). However, where plaintiffs allege reverse discrimination, the analysis is changed somewhat. *See Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999) (noting that literal application of the first element of the prima facie case would preclude white plaintiffs from establishing a prima facie case). In reverse discrimination

cases, "a non-minority plaintiff must show [that] (1) he or she was qualified for the position in question, (2) he or she suffered an adverse employment action, and (3) the evidence is adequate to create an inference that the adverse employment action was based on a trait protected by Title VII." *Warenecki*, 2010 WL 4344558, at *5 (citing *Mosca v. Cole*, 384 F. Supp. 2d 757, 765 (D.N.J. 2005)).

Defendants concede that Plaintiff was qualified for his position and that he suffered an adverse employment action. Defendants argue that Plaintiff fails to establish a prima facie case because he cannot identify any similarly situated persons outside his protected class who were treated more favorably, and because the circumstances surrounding Plaintiff's termination do not support an inference of discrimination. (Defs.' Mot. 17-20.) Plaintiff counters that he is not required to show that similarly situated employees outside his protected class were treated more favorably, and that in any event, three African American employees who said or wrote the word "nigger" in the workplace were not disciplined in any way. (Pl.'s Resp. 50-51.)

Although showing that similarly situated coworkers were treated more favorably than the plaintiff is one method of satisfying the final element of a prima facie case of discrimination, it is not the only one. The Third Circuit has explained that although some circuits have required plaintiffs to make such a showing in discrimination cases, "that is not the current law in this or the majority of the circuits." *Sarullo*, 352 F.3d at 798 n.7 (citations omitted). Indeed, the Third Circuit has counseled in *Sarullo* and elsewhere that the prima facie case is intended to be a flexible standard. *See id.* at 797-98 ("[T]he prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996))); *see also Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (the prima facie test must be "tailored to fit the specific context in which it is applied" (quoting

*Sarullo*, 352 F.3d at 797-98) (internal quotation marks omitted)); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in *McDonnell Douglas*, which begins with proof of a prima facie case, was 'never intended to be rigid, mechanized, or ritualistic.'" (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978))). The Third Circuit has stated that to establish a prima facie case, it is sufficient for a plaintiff to adduce evidence that "establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a juror could infer, in light of common experience, that the defendant acted with discriminatory intent." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir. 2010) (discussing prima facie case in § 1981 context); *Sarullo*, 352 F.3d at 798 (plaintiff "must establish some causal nexus between his membership in a protected class" and the adverse employment decision to establish a prima facie case of discrimination in Title VII case).

Plaintiff points to three African American comparators who stated or wrote the word but were not disciplined by the Station: David Huddleston, John Jervay, and Joyce Evans. (Pl.'s Resp. 48-49.) Plaintiff testified in his deposition that during a newsroom editorial meeting, his coworkers were discussing a "dumb criminal" story in which the criminal was African American. Huddleston, who is African American, commented, "Man, that's one dumb nigger." (Pl.'s Dep. 194:18-195:1.) The meeting attendees all laughed. (*Id.*) Plaintiff testified that Leslie Tyler, who is part of the management team, was at the meeting. (*Id.* at 196:22-25.) Tyler does not recall Huddleston saying the word or hearing people talk about this alleged exchange. (Tyler Dep. 122:10-15.) Huddleston was not disciplined by the Station for saying the word.

Defendants argue that Huddleston is not similarly situated to Plaintiff. Defendants point out that there was a different General Manager at the Station when Huddleston made his comments and argue that "where there are different decisionmakers, employees are not similarly

situated." (Defs.' Reply 20.)  Defendants cite a district-court case and an unpublished Third

Circuit case as support for this proposition.  (*See id.* (citing *Goins v. EchoStar Comms. Corp.*,

148 F. App'x 96, 98 (3d Cir. 2005) (per curiam) (non-precedential); *Coulton v. Univ. of Pa.*, No.

05-1446, 2006 WL 759701, at *7 n.3 (E.D. Pa. Mar. 21, 2006)).)  Neither Plaintiff nor

Defendants point to any Third Circuit authority on this issue.  The cases that Defendants cite

involve a plaintiff and comparator who were supervised concurrently by two different supervisors

within the company—not by one supervisor who was then replaced by another.  *See Goins*, 148 F.

App'x at 98 ("Even if a different manager knew about [the comparator's] behavior and chose to

do little, or nothing at all, the operative employment decision made by a different independent

manager asserting her discretion is sufficient to differentiate two otherwise similarly situated

employees." (citations omitted)); *Coultan*, 2006 WL 759701, at *7 n.3 (noting that courts "have

distinguished a plaintiff from his claimed comparators based on the presence of different

decision-makers even in cases where the employment decisions at issue were made through

institutional mechanisms;" the decisionmakers at issue were employed by defendant concurrently)

(citations omitted).

    We can see a distinction between two employment decisions made by two different

managers who served concurrently in the same organization on the one hand, and two

employment decisions made by a manager and his eventual replacement on the other.  Moreover,

we are mindful of the Seventh Circuit's admonition that "[d]ifferent employment decisions,

concerning different employees, made by different supervisors, are seldom sufficiently

comparable to establish a prima facie case of discrimination for the simple reason that different

supervisors may exercise their discretion differently."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d

612, 618 (7th Cir. 2000).  However, under the facts of this case, this appears to be a distinction

without a difference. While the General Manager of the station may have been different when Huddleston made his comment, we find that the overall situation was sufficiently similar to make Huddleston an appropriate comparator in this situation. During a newsroom editorial meeting, Huddleston made a comment using the word, his coworkers laughed, but management was not notified. During a newsroom editorial meeting Plaintiff used the word, his co-workers got upset, and management was notified. That the identity of the General Manager changed in the interim is of little consequence. Huddleston is a similarly situated employee who is not a member of Plaintiff's class, and he was treated more favorably than Plaintiff after saying the word in a newsroom editorial meeting.

Defendants also argue that Huddleston's comments did not incite complaints from his coworkers and negative publicity for the Station the way Plaintiff's comments did, and Huddleston is therefore not an appropriate comparator for the purpose of establishing a prima facie case. (Defs.' Mot. 17-18.) This argument misses the point. Plaintiff contends that his coworkers' reaction and the negative publicity that resulted were all the product of racial discrimination that ultimately influenced management. The point of a comparator analysis is that when two employees of different races who act in a similar manner are treated differently, it permits the inference that the race of the employees accounts for the difference.

Following the June 23rd newsroom editorial meeting, John Jervay, an African American, wrote an email to Phil Metlin and Leslie Tyler explaining that "during the news meeting the word nigger was used by Tom Burlington." (Defs.' Mot. Ex. 18.) Jervay's email used the word twice more in all capital letters. (*Id.*) Defendants argue that Jervay simply "accurately reported and described Plaintiff's offensive use of the word," so his use of the word was therefore not as serious as Plaintiff's. (Defs.' Mot. 21-22.) But when Plaintiff was asked during the June 29th

meeting to explain what had happened in the June 23rd newsroom editorial meeting, Plaintiff's use of the word provoked an immediate reaction from Ameena Ali and Phil Metlin. Plaintiff testified that Ali said, "I can't believe you said it again. . . . Don't you know you can't use that word?" (Pl.'s Dep. 214:14-23.) Mirroring Defendants' explanation of Jervay's use of the word, Plaintiff replied that he was simply relating what had happened at the editorial meeting, as Metlin had requested. (*Id.* at 214:25-215:3.) Metlin suspended Plaintiff, although Plaintiff's suspension had been ordered by Mike Renda before the meeting. (*Id.* at 216:17-19; Ali Dep. 138:17-139:8.) Jervay, by contrast, was never disciplined for using the word under almost the same circumstances as Plaintiff during the June 29th meeting. General Manager Mike Renda's explanation of this inconsistency was as follows:

> Q.   And in this email [Jervay] uses the word—the full word nigger three times?
> A.   Correct.
> Q.   And is that a violation of Fox policy for him to have done it?
> A.   He was quoting Tom Burlington in an investigation.
> Q.   So that it was acceptable for him to do that?
> A.   We asked him what was said.
> Q.   And he—my question is: Was it a violation of Fox policy for him to use the word?
> A.   Not in the context of this investigation.
> Q.   Earlier I was talking to you about when Ameena Ali questioned Tom Burlington about what he said in the meeting and Tom Burlington used the full word nigger when he recounted what happened, and you said that would be a violation of policy.
>      [. . .]
> Q.   Let me ask you again. Would it be a violation of policy for Tom Burlington to have used the full word with Ameena Ali when he was asked about the incident?
>      [. . .]
> A.   It was inappropriate.
> Q.   My question is—
> A.   No.
> Q.   Okay.
> A.   Well, wait a second. Let me take that back. The fact is that any time you use the word, it is a violation.
> Q.   Okay. So then looking at this email, was it a violation for John Jervay to

| | |
|---|---|
| | type this word, send it in an e-mail and use it three times? |
| A. | I will repeat what I said.  No.  He was asked to send this as part of the investigation. |
| Q. | Well, you just said that any time that the word is used, it's a violation of policy.  So that's not true? |
| A. | I stand by what I said. |
| Q. | Well, it doesn't make sense.  Is it always a violation of policy or are there exceptions? |
| A. | We asked John Jervay what happened, and he reported to us. |
| Q. | My question is different.  Is it always a violation of policy or are there exceptions? |
| | [. . .] |
| A. | I don't know. |

(Renda Dep. 102:23-105:14.)  A reasonable jury could conclude that Renda's testimony demonstrates that Defendants were unable to draw a principled, non-race-based distinction between Jervay's use of the word in describing what happened at the newsroom editorial meeting and Plaintiff's use of the word when he was asked to describe what had happened at the meeting. Plaintiff's use of the word elicited a severely negative reaction, brought the meeting to a close before he could explain himself, and was followed by his immediate suspension, while Jervay's use of the word elicited only Defendants' defense of his actions.  Plaintiff is white.  Jervay is African American.  Management's inability to explain *why* Jervay was allowed to use the word while Plaintiff was not permits the inference that their races influenced the decision, and that a similarly situated African American employee was treated more favorably than Plaintiff under similar circumstances.[4]

Given the Third Circuit's repeated admonitions that "the plaintiff's burden at this first stage is not particularly onerous," *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008), we find that Plaintiff has satisfied his burden of establishing a prima facie case of

---

[4] We agree with Defendants that Joyce Evans is not a similarly situated employee. Plaintiff did not report her alleged use of the word to management until Plaintiff filed his EEOC charge, which was well after his termination.

discrimination.

(ii)         Defendants' legitimate, non-discriminatory reasons for Plaintiff's termination

Defendants offer three legitimate, non-discriminatory reasons for Plaintiff's termination: First, Defendants offer Plaintiff's misconduct in using the word "nigger" at the editorial meeting and repeatedly thereafter as a legitimate, non-discriminatory reason. Next, Defendants offer the adverse impact that Plaintiff's misconduct had in the workplace as a reason. Finally, Defendants offer the negative publicity and public embarrassment that Plaintiff's conduct generated as a reason. (Def's Reply 12-15.) Defendants contend that their action in suspending and terminating Plaintiff or in not renewing his contract had nothing to do with race. Rather, their action was a result of Plaintiff's outrageous use of a word that was hurtful to his coworkers, caused a disruption in the newsroom, and caused the Station to be subjected to adverse publicity resulting in the Station and Plaintiff being brought into public contempt, ridicule, and disrepute. Defendants contend that this was in direct violation of the terms and conditions of Plaintiff's employment agreement and justified the suspension and termination. Plaintiff argues that Defendants' reasons themselves rely on impermissible racial considerations, because Plaintiff's coworkers' reactions to his statements and the negative publicity that they generated are based on the assumption that it is permissible for an African American to use the word, but not a white person. (Pl.'s Resp. 51-57.) Plaintiff points out that he did not use the word in its pejorative sense; rather, he used it in an academic newsroom discussion of a news story involving the word and he had no intention of belittling or hurting anyone. Moreover, the adverse publicity that followed the newsroom discussion was the result of the discriminatory animus of his coworkers who leaked the story to the newspaper in violation of company policy and without any investigation or sanction. Assuming the existence of legitimate, nondiscriminatory reasons for

Plaintiff's termination, we must determine whether those reasons are simply a pretext for discrimination.

(iii)    Pretext

Since Defendants have responded to Plaintiff's prima facie case with legitimate, nondiscriminatory reasons for their action, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Based upon the totality of the evidence, we are compelled to conclude that a reasonable jury could find that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendants' action, or that the legitimate, nondiscriminatory reasons were not the real reasons for the termination. *See id.*

We begin by addressing an issue that does not appear to have been decided by the federal courts: can an employer be held liable under Title VII for enforcing or condoning the social norm that it is acceptable for African Americans to say "nigger" but not whites? The text of the statute is the starting point for our analysis. *Lawrence v. City of Phila.*, 527 F.3d 299, 322 (3d Cir. 2008). Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). It is well settled that Title VII's prohibition of race-based discrimination protects white employees as well as minority employees. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-79 (1976) (stating that Title VII is "not limited to discrimination against members of any particular race"). As the law by its terms outlaws treating employees of one race differently from another race, the question becomes is there some justification for treating the white

employee who says the word differently from the African American employee who says the word.

In *Towne v. Eisner*, 245 U.S. 418, 425 (1918), Justice Holmes observed that "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." This is certainly so with this particular word. Merriam-Webster notes in the usage section of its definition of the word that "[i]ts use by and among blacks is not always intended or taken as offensive, but . . . it is otherwise a word expressive of racial hatred and bigotry." *Merriam Webster's Collegiate Dictionary* 837 (11th ed. 2005); *see also* Randall Kennedy, *Nigger: The Strange Career of a Troublesome Word* 105-08 (First Vintage Books ed. 2003). Professor Kennedy, an African American, made the observation that

> many people, white and black alike, disapprove of a white person saying "nigger" under virtually any circumstance. "When we call each other 'nigger' it means no harm," [rapper] Ice Cube remarks. "But if a white person uses it, it's something different, it's a racist word." Professor Michael Eric Dyson likewise asserts that whites must know and stay in their racial place when it comes to saying "nigger." He writes that "most white folk attracted to black culture know better than to cross a line drawn in the sand of racial history. *Nigger* has never been cool when spit from white lips."

Kennedy, *supra*, at 41. Historically, African Americans' use of the word has been ironic, satirical, or even affectionate. *Id.* at 28-31. Too often, however, the word has been used by whites as a tool to belittle, oppress, or dehumanize African Americans. When viewed in its historical context, one can see how people in general, and African Americans in particular, might react differently when a white person uses the word than if an African American uses it.

Nevertheless, we are unable to conclude that this is a justifiable reason for permitting the Station to draw race-based distinctions between employees. It is no answer to say that we are interpreting Title VII in accord with prevailing social norms. Title VII was enacted to counter social norms that supported widespread discrimination against African Americans. *See*

*McDonnell Douglas*, 411 U.S. at 800 (stating that the purpose of Title VII was "to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens"). To conclude that the Station may act in accordance with the social norm that it is permissible for African Americans to use the word but not whites would require a determination that this is a "good" race-based social norm that justifies a departure from the text of Title VII. Neither the text of Title VII, the legislative history, nor the caselaw permits such a departure from Title VII's command that employers refrain from "discriminat[ing] against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

With the foregoing in mind, there is evidence in this case to suggest that at least two African Americans said the word in the workplace with no consequences. Dave Huddleston described the subject of a "dumb criminal" story as a "dumb nigger." (Pl.'s Dep. 194:18-195:1.) Like Plaintiff, Huddleston used the word in a newsroom editorial meeting. (*Id.*) Unlike Plaintiff, Huddleston clearly used the word in its pejorative sense, rather than in a philosophical discussion of the word itself. Unlike Plaintiff, Huddleston's coworkers simply laughed, and management was not notified. Similarly, John Jervay used the word in an email while describing what had transpired at the newsroom editorial meeting. (Defs.' Mot. Ex. 18.) When Plaintiff used the word for the same purpose in the June 29th meeting, it brought the meeting to an abrupt end, with Ameena Ali chastising Plaintiff and Phil Metlin suspending him. While Jervay obviously was not describing his *own* previous usage of the word as was Plaintiff during the June 29th meeting, Mike Renda's deposition testimony attempting to explain why it was permissible for Jervay to say the word under those circumstances but not Plaintiff demonstrates that the General Manager of the Station was unable to reconcile this inconsistency. (*See* Renda Dep. 102:23-105:14.)

In addition, Plaintiff has adduced facts about Joyce Evans's role in Plaintiff's suspension

and termination that would permit a factfinder to infer that Plaintiff's suspension and termination were motivated at least in part by his race. If Plaintiff is believed, upon learning of Plaintiff's use of the word in the newsroom editorial meeting, Evans informed Plaintiff that he could not say the word because he was white—a statement that would have violated the Station's EEO policies, according to the Station's own human resources manager. (Pl.'s Dep. 157:9-14; Ali Dep. 109:11-110:3.) Thereafter, Plaintiff overheard Evans telling another employee that "people get fired for using that word." (Pl.'s Dep. 194:2-7.) The next day, Evans called Leslie Tyler at home to inform her about Plaintiff's use of the word in the previous day's newsroom editorial meeting. (Tyler Dep. 14:17-15:21.) Evans told Tyler that as the Assistant News Director, Tyler should know what had happened in the meeting and how people reacted to it. (*Id.*) Later that week, Evans told Becky Rogers, who is white, that "the only people that have said anything so far have been black people. I think it's important they know that you felt offended." (Rogers Dep. 103:8-11.) On July 1, 2007, Rogers emailed Tyler about Plaintiff's behavior in the newsroom editorial meeting. (*See* Pl.'s Resp. Ex. II.)

Plaintiff was suspended on June 29th. A reasonable jury could conclude based upon the evidence that as of July 9th, Plaintiff was going to be permitted to return to work. Mike Renda wrote an email to Ameena Ali on July 9th stating that "[w]e need to talk about return scenario—news would like him to return Wed."[5] (Pl.'s Resp. Ex. NN.) Defendants deny that any

<hr>

[5] Renda testified in his deposition that a decision had not yet been made on whether to bring Plaintiff back or not, and that his email meant that news (meaning Leslie Tyler and Phil Metlin) wanted to know for scheduling purposes whether Plaintiff would be back on Wednesday. (Renda Dep. 53:21-55:24.) Similarly, Ameena Ali testified that Renda's email, which stated that "News would like him to return Wed," actually meant that "they [news] were working on scheduling and they were anxious to know, you know, what was going on." (Ali Dep. 252:18-24.) Construing the evidence in a light most favorable to Plaintiff, *see Brown*, 581 F.3d at 179, it is reasonable to assume that Renda's email establishes that Defendants were contemplating bringing Plaintiff back to work by Wednesday, July 11th.

decision had been made by July 9th to allow Plaintiff to return to work, however. (Renda Dep. 56:8-11.) On July 12th, Plaintiff was terminated. (Pl.'s Dep. 244:23-245:6.) The only evidence in the record about what happened between July 9th and July 12th involves Joyce Evans. On July 10th, Evans called Ali to inform her that Evans was receiving phone calls from the NABJ and the PABJ regarding Plaintiff's use of the word at the newsroom editorial meeting. (Pl.'s Resp. Ex. OO.) Evans also told Ali that "people [were] talking to [her] on the street" about Plaintiff's behavior. (Evans Dep. 138:18-21.) However, Evans testified in her deposition that she did not actually talk to anyone at the NABJ or the PABJ—she received a voicemail from each organization. (*Id.* at 137:13-138:21.) Moreover, Evans could not name anyone "on the street" who had spoken to her regarding Plaintiff's behavior. (*Id.* at 137:7-140:12.) Evans also told Ali that she was concerned about her on-air chemistry with Plaintiff in light of Plaintiff's actions. (*Id.* at 301:19-21.) Before Evans's call, Ali testified that she had no reason to believe that Plaintiff was going to be terminated. (Ali Dep. 298:21-299:1.) Plaintiff was terminated two days after Evans's conversation with Ali. (Pl.'s Dep. 244:23-245:6.)

Plaintiff also contends that Evans has a history of similar discriminatory behavior. (*See* Pl.'s Resp. 71-72.) In 2003, a white former Fox News anchor whose contract had not been renewed sued Fox for discrimination in violation of Title VII. *See Noonan v. Fox Television Stations of Phila., Inc.*, No. 03-5044 (E.D. Pa. 2003). The complaint in *Noonan* alleged that the plaintiff's contract had not been renewed because Fox wanted to replace him with an African American, which it did after his contract expired. *See* Complaint, Noonan v. Fox Television Stations of Phila., Inc., No. 03-5044 (E.D. Pa. Oct. 3, 2003), ECF No. 2. In her deposition in *Noonan*, Evans testified that she had told the General Manager and two News Directors that Fox "had a [news] team that was very white," and that people were concerned that a Fox News

billboard with four white anchors was located in predominantly African American and Latino neighborhoods. (Evans Dep. (Noonan) 56:8-9, 58:20-59:4, June 24, 2004, Pl.'s Resp. Ex. TT, ECF No. 28.) When asked who was expressing concern about the racial composition of Fox's news team, Evans was unable to name anyone specifically, attributing this view to "people on the street" (*id.* at 57:20) and "people leaving a voice mail." (*Id.* at 64:14-15.)

Plaintiff argues that the actions of Joyce Evans and his other coworkers in the wake of the June 23rd newsroom editorial meeting were motivated by discriminatory animus and therefore do not provide a permissible basis for his termination. (Pl.'s Resp. 51-53.) In essence, Plaintiff seeks to hold Defendants liable for the discriminatory animus of his coworkers. Defendants counter that general manager Mike Renda was the sole decisionmaker in terminating Plaintiff's employment, and there is no evidence that his actions were based on Plaintiff's race. (Defs.' Reply 12-15.) Under the theory of "subordinate bias liability," *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006), also referred to as "cat's paw" liability, *see Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (Posner, J.), a company can be liable for an adverse employment decision under Title VII even where the ultimate decisionmaker was not motivated by racial animus if the decision was caused or influenced by those exhibiting discriminatory animus. Most circuits, including the Third Circuit, have adopted subordinate bias liability in some form. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (finding that even if the decisionmaker himself does not harbor discriminatory animus, "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate").

There is disagreement among the circuits regarding the amount of influence a subordinate must have on a plaintiff's termination for the subordinate's discriminatory animus to be imputed

to the employer.  On one end of the spectrum, the Fourth Circuit requires plaintiffs to establish

that the employer merely rubber-stamped an adverse employment action recommended by the

biased subordinate such that "the subordinate is the actual decisionmaker or the one principally

responsible for the contested employment decision." *Hill v. Lockheed Martin Logistics Mgmt.,

Inc.*, 354 F.3d 277, 290 (4th Cir. 2004).  At the other end of the spectrum, several circuits follow

a more relaxed standard, finding "that it is appropriate to tag the employer with an employee's . . .

animus if the evidence indicates that the worker possessed leverage, or exerted influence, over the

titular decisionmaker." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000);

*see also Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of

a subordinate's bias is relevant where the ultimate decision maker is not insulated from the

subordinate's influence."); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir.1994)

("[S]ummary judgment generally is improper where the plaintiff can show that an employee with

discriminatory animus provided factual information or other input that may have affected the

adverse employment action." (citing *Shager*, 913 F.2d at 405)).  The Tenth Circuit has settled on

a middle ground in which a subordinate's discriminatory animus can be imputed to the employer

if "the biased subordinate's discriminatory reports, recommendation, or other actions caused the

adverse employment action." *BCI*, 450 F.3d at 487.

The Third Circuit has not addressed the circuit split with regard to the showing that a

plaintiff must make to impute a subordinate's bias to the employer. *McKenna v. City of Phila.*,

No. 98-5835, 2010 WL 2891591, at *28 (E.D. Pa. July 20, 2010).  However, in *Abramson*, the

Third Circuit permitted a plaintiff to recover when "those exhibiting discriminatory animus

influenced or participated in the decision to terminate" the plaintiff. *See Abramson*, 260 F.3d at

286.  This language is similar to the language used by the circuits that impose a lighter burden on

a plaintiff who seeks to establish subordinate bias liability. Plaintiff cites *Abramson* as support for his case. (*See* Pl.'s Resp. 51.) Defendants have not attempted to distinguish it.

We conclude that there is a triable issue of fact as to whether "those exhibiting discriminatory animus influenced or participated in the decision to terminate" Plaintiff. *See Abramson*, 260 F.3d at 286. Viewing the evidence in the light most favorable to Plaintiff, and making all inferences in his favor, there are genuine issues of material fact regarding whether Plaintiff's coworkers in general, and Joyce Evans in particular, exhibited discriminatory animus and influenced the decision to terminate Plaintiff. *See id.* Evans did not hear Plaintiff's remarks firsthand. Yet she involved herself in the situation from nearly the beginning, when she called Leslie Tyler at home on a Sunday to inform her about what Plaintiff had said, and remained involved until two days before Plaintiff's termination, when she phoned Ameena Ali to express concerns about her on-air chemistry with Plaintiff if he returned to work and to inform Ali that "people on the street" were offended by Plaintiff's behavior. A jury must assess the actions and motivation of Evans, Plaintiff's coworkers, and the Station management. Viewing the record as a whole, and keeping in mind the Third Circuit's admonition that "[s]ummary judgment is to be used sparingly in employment discrimination cases," *Doe*, 527 F.3d at 369, we conclude that Plaintiff has adduced sufficient evidence for a reasonable jury to "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 264. Summary judgment is therefore inappropriate on Plaintiff's discrimination claims under Title VII, the PHRA, and § 1981.

### 2.    *Mixed-Motive Analysis*

While courts in this district have analyzed mixed-motive cases under both *McDonnell Douglas* and the mixed-motive paradigm set forth in 42 U.S.C. § 2000e-2(m), *see Young*, 2010

WL 4290165, at *11, we believe that performing a mixed-motive analysis in this case would be redundant. We have determined that under *Fuentes*, Plaintiff has adduced evidence from which a reasonable jury could "believe that an invidious discriminatory reason *was more likely than not a motivating or determinative cause* of the employer's action." 32 F.3d at 764 (emphasis added). This formulation from *Fuentes* is similar to the inquiry that courts use in a mixed-motive analysis. *Compare Desert Palace*, 539 U.S. at 101 ("[A] plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin *was a motivating factor* for any employment practice." (quoting 42 U.S.C. § 2000e-2(m)) (emphasis added)). Thus, where a court performing a *McDonnell Douglas* analysis has fully considered whether "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action," *Fuentes*, 32 F.3d at 764, it seems redundant to then consider whether an impermissible trait "was a motivating factor for any employment practice," 42 U.S.C. § 2000e-2(m), under the mixed-motive analysis.

We are not the first court to recognize the similarity of the two analyses. *See Hartwell v. Lifetime Doors, Inc.*, No. 05-2115, 2006 WL 381685, at *5 n.6 (E.D. Pa. Feb. 16, 2006) (noting that "the language in *Desert Palace* describing the plaintiff's burden in mixed-motive cases . . . is similar to the language used by the Third Circuit's opinion in *Fuentes v. Perskie* describing the second manner in which a plaintiff can show pretext" (citations omitted)). Therefore, we find that a reasonable jury could return a judgment in Plaintiff's favor under a mixed-motive analysis for the same reasons for which we found that Plaintiff has met the requirements of *Fuentes* in Section III.A.1.iii.

### B.    Plaintiff's Hostile Work Environment Claim

Plaintiff alleges that he was subjected to a hostile work environment in violation of Title

VII. (Compl. ¶¶ 45, 48-51.) Defendants argue that there is insufficient evidence to establish a genuine issue of material fact regarding Plaintiff's hostile work environment claim. (Defs.' Mot. 24-26.) We agree with Defendants that Plaintiff's hostile work environment claim cannot survive summary judgment.

To establish that Defendants subjected him to a hostile work environment in violation of Title VII, Plaintiff must show that: "(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001) (alterations in the original)).

For Plaintiff to prevail on a claim for hostile work environment, the Station's discriminatory conduct "must be so 'severe and pervasive' that it actually 'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'" *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998) (alterations in the original). In determining whether the conduct at issue is sufficiently extreme to constitute a violation of Title VII, we must consider the "totality of the circumstances." *Id.* (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990) (internal quotation marks omitted)). These circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993).

Plaintiff has failed to produce sufficient evidence for a reasonable jury to find that he was subjected to a hostile work environment in violation of Title VII. Plaintiff himself states that the

hostile work environment only commenced when he said the word at the June 23, 2007, newsroom editorial meeting. (Pl.'s Resp. 81.) Plaintiff was suspended on June 29th and terminated on July 12th. Thus, Plaintiff alleges that he endured a hostile work environment for the final 19 days of his two-and-a-half-year employment at the Station. He spent all but six of these 19 days at home while suspended. Plaintiff alleges that several incidents during those six days show that he was subjected to a hostile work environment. He points to Joyce Evans's admonition that Plaintiff could not understand what it feels like to be called a "nigger" and could not use that word at work. (*Id.*) He states that his use of the word in the newsroom editorial meeting "elicited a negative response from both coworkers and management because he is white." (*Id.*) He also contends that his coworkers tried to ruin his career by feeding false and defamatory information about him to the media. (*Id.*)

We cannot agree that the behavior recited by Plaintiff constitutes behavior that is so severe or so pervasive that it gave rise to a claim for hostile work environment. Indeed, these are precisely the kind of "isolated incidents" and "offhand comments" that the Supreme Court has warned "will not amount to discriminatory changes in the terms and conditions of employment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (quoting *Faragher*, 524 U.S. at 788). Plaintiff has failed to establish a genuine issue of material fact regarding his hostile work environment claim.

### C. Defendants' Motion for Summary Judgment on Damages

#### 1. After-Acquired Evidence

Defendants argue that after-acquired evidence of Plaintiff's misconduct precludes him from receiving front pay or reinstatement, and limits his back pay from the time of his termination to the date of Defendants' discovery of Plaintiff's misconduct. (Defs.' Mot. 28-29.)

Defendants contend that Plaintiff worked as a media consultant for General Parts, Inc., from September through December 2007, in violation of his contract with Fox.  (*Id.*)  Because Plaintiff was still under contract with Fox when he performed this work, Defendants argue that even if Plaintiff had not been terminated for his behavior during and after the newsroom editorial meeting, he would have been terminated for performing work for General Parts, Inc.  (*Id.*)  Plaintiff counters that the contractual provisions at issue do not apply to the work Plaintiff did for General Parts and that whether the Station would have fired Plaintiff is a question of fact that is not appropriate for summary judgment.  (Pl.'s Resp. 88-90.)  Plaintiff also contends that because Plaintiff would not have consulted for General Parts if he had not been terminated from his position at the Station, the after-acquired evidence doctrine cannot limit his damages.  (*Id.* at 98-90 (citing *McKenna v. City of Phila.*, 636 F. Supp. 2d 446, 464 (E.D. Pa. 2009) ("*McKenna I*").)

We agree with Plaintiff.  Plaintiff was informed on July 12, 2007, that he would not be permitted to return to the Station and that his contract would not be renewed when it expired in February 2008.  In *McKenna I*, the court stated that if it is "more likely than not that the misconduct at issue would not have occurred in the absence of the defendant's wrongdoing, then it would be inequitable to use that misconduct to cut off the plaintiff's right to back pay."  636 F. Supp. 2d at 464.  There is sufficient evidence in the record to establish a triable issue of fact as to whether it is "more likely than not" that Plaintiff would not have worked for General Parts in the absence of Defendants' alleged wrongdoing.  *Id.*  The after-acquired evidence doctrine does not limit Plaintiff's recovery at this stage of the litigation.

### 2. Mitigation of Damages

Defendants argue that Plaintiff's claim for damages should be limited because he has failed to mitigate his damages.  (Defs.' Mot. 29-30 (citing *Caufiled v. Ctr. Area Sch. Dist.*, 133 F.

App'x 4, 10 (3d Cir. 2005)).) Defendants state that after losing his job with Fox, Plaintiff "made no effort to find a job in broadcasting on his own" and "relied on his agents to find him a job." (*Id.*) Defendants point out that in December 2009, Plaintiff's agents discontinued their relationship with him, and Plaintiff did not seek additional representation because he was "no longer 'actively looking for a job in broadcasting.'" (*Id.* (citing Pl.'s Dep. 94-95).) Plaintiff argues that he tried to find work in broadcasting after his termination. To that end, he "made a tape, met his contacts at Channel 3 and Channel 10 to see if there were any openings, [and] had agents actively looking on his behalf . . . . However, notwithstanding his efforts, he received no interviews or offers of employment in broadcasting." (Pl.'s Resp. 86.)

Defendants have the burden of establishing that Plaintiff failed to mitigate his damages. *Brown v. Nutrition Mgmt. Servs. Co.*, No. 06-2034, 2010 WL 2902557, at *3 (E.D. Pa. July 22, 2010) (citing *Anastasio v. Schering Corp.*, 838 F.2d 701, 707 (3d Cir. 1988)). To meet their burden, Defendants must show "that substantially equivalent work was available, and that [Plaintiff] did not exercise reasonable diligence in attempting to secure such employment." *Id.* (citing *Anastasio*, 838 F.2d at 708). There is a genuine issue of material fact regarding whether Plaintiff exercised reasonable diligence in attempting to secure employment as a broadcaster, and whether substantially equivalent work was available to Plaintiff. Summary judgment is therefore inappropriate.

## IV.    CONCLUSION

This case presents unique issues regarding an employer's liability under Title VII for cultural assumptions about a word that is considered by many to be the most offensive in the English language. Plaintiff portrays himself as a victim of political correctness run amok, while Defendants portray themselves as employers who made the only choice they could in response to

an employee who repeatedly uttered "the most noxious racial epithet in the contemporary American lexicon," *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998), resulting in problems in the workplace and significant adverse publicity. Whether Plaintiff was a victim of discrimination or his own poor judgment is for a jury to decide. Defendants' Motion for Summary Judgment is granted in part and denied in part.

An appropriate Order follows.

**BY THE COURT:**


/**s**/ *R. Barclay Surrick*
U.S. District Judge
