IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS BURLINGTON                  :
                                   :          CIVIL ACTION
              v.                   :
                                   :          NO. 09-1908
NEWS CORPORATION, ET AL.           :

**SURRICK, J.**                                    OCTOBER  24 , 2014

<u>**MEMORANDUM**</u>

Presently before the Court is Defendants' Motion for Reconsideration.  (ECF No. 50.)

For the following reasons, Defendants' Motion will be denied.

**I.      BACKGROUND**

This is an action for race discrimination under Title VII of the Civil Rights Act of 1964,

42 U.S.C. §§ 2000a, *et seq.*, 28 U.S.C. § 1981, and the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. §§ 951, *et seq.*  Plaintiff Thomas Burlington, a white male, alleges

that he was terminated by his employer[1] for using the word "nigger" in a non-pejorative manner

during a newsroom editorial meeting, while African American employees were not punished for

using the word in the workplace.  (Compl. ¶¶ 26-42, ECF No. 1.)

---

[1] Defendant News Corporation was dismissed from this litigation by stipulation of the
parties.  (*See* Stipulation of Dismissal, ECF No. 27.)  The remaining defendants are Fox
Television Stations, Inc., and Fox Television Stations of Philadelphia, Inc. (collectively "the
Station," "Fox," or "Defendants").

**A.      Facts**[2]

Plaintiff was hired by Defendants as a reporter in December 2004.  (Pl.'s Dep. 146:16-20, Pl.'s Resp. Mot. Summ. J. Ex. A, ECF No. 28.)  Plaintiff received a B.S. in Journalism from the University of Colorado in 1984 and an M.A. from Wake Forest University in 1994.  (Pl.'s Resp. Mot. Summ. J. Ex. B at 1.)  He had 17 years of experience as a reporter or anchor when he was hired by Defendants.  (*Id.*)  Plaintiff won several awards for his reporting, including the Edward R. Murrow Award.  (*Id.*)  His written evaluations while an employee at the Station rate him as a "Solid Performer."  (*See* Pl.'s Resp. Mot. Summ. J. Ex. F, Ex. G (two evaluations rating Plaintiff a "3 - Solid Performer" on a 1 to 5 scale).)  Plaintiff was promoted to weekend anchor/reporter on February 20, 2006.  (Pl.'s Resp. Mot. Summ. J. Ex. H.)  Joyce Evans, an African American female, was Plaintiff's weekend co-anchor.  (Pl.'s Dep. 148:16-17.)

The Station regularly held newsroom editorial meetings in which its journalists discussed the stories that would air on that evening's news broadcast.  (Renda Dep. 95:23-96:8, Pl.'s Resp. Mot. Summ. J. Ex. J.)  Plaintiff claims that he suffered reverse discrimination as a result of a comment that he made at a newsroom editorial meeting on June 23, 2007.  Plaintiff attended the June 23rd newsroom editorial meeting along with eight of his coworkers.  The individuals who attended the meeting and their races are as follows:

- •      Plaintiff—White
- •      Christopher Denton—White
- •      Cynthia Cappello—White

---

[2] The facts are largely taken from our summary-judgment opinion of December 23, 2010. *See Burlington v. News Corp.*, 759 F. Supp. 2d 580, 584-89 (E.D. Pa. 2010).

- Charles Edmondson—White
- John Jervay—African American
- Rebecca Rogers—White
- Tor Smith—African America
- Robin Taylor—White
- Nicole Wolfe—African American

(Pl.'s Resp. Mot. Summ. J. Ex. O at 7-8.)  During the June 23rd meeting, the group discussed a

story about the Philadelphia Youth Council of the NAACP holding a symbolic burial for the

word "nigger."  (Pl.'s Dep. 161:13-19.)  Robin Taylor was assigned to the story.  (Taylor Dep.

63:4-8, Pl.'s Resp. Mot. Summ. J. Ex. N.)  Taylor had attended the symbolic burial and testified

that the participants at the burial used the word "at least a hundred times or more" during the

course of the proceedings.  (*Id.* at 65:9-13.)  Taylor discussed the story with her colleagues at the

editorial meeting and consistently referred to the racial slur as "the n-word" instead of using the

full word.  (Taylor Dep. 80:21-81:4.)  During the meeting, Plaintiff asked, "Does this mean we

can finally say the word 'nigger?'"  (Pl.'s Dep. 162:3-4.)  Taylor said that she would not say the

word in her story.  (*Id.* at 163:16-22.)  Plaintiff told Taylor that although he did not necessarily

expect her to use the word in her story, he thought that doing so gave the story more credence.

(Taylor Dep. 82:20-83:10.)  At his deposition, Plaintiff testified that he "wanted to make the

point that I felt if we're going to refer to the word 'nigger,' we should either say the word

'nigger' or refer to it as a racial epithet or a slur instead of using the phrase the 'N' word."  (Pl.'s

Dep. 161:20-24.)  Plaintiff used the word once during the newsroom meeting.  (*Id.* at 165:17-21;

Taylor Dep. 87:12-14.)  Nicole Wolfe exclaimed in response to Plaintiff's use of the word, "I

can't believe you just said that!"  (Pl.'s Dep. 182:15-18; Tyler Dep. 16:14-18, Pl.'s Resp. Mot.

Summ. J. Ex. K.)  Neither Plaintiff nor Taylor recalls anyone else saying anything on this subject

during the meeting.  (Pl.'s Dep. 163:23-24; Taylor Dep. 85:6-10.)

3

After the discussion about whether to use the word, the meeting proceeded as normal, though Plaintiff noticed that his comments had elicited a negative reaction from Nicole Wolfe. (Pl.'s Dep. 163:2-164:10.)  Wolfe later told Taylor that she was offended by Plaintiff's use of the racial slur during the meeting.  (Taylor Dep. 88:8-18.)  Nobody at the meeting believed that Plaintiff used the word in its pejorative sense as a racial slur.  (*See, e.g.*, Ali Dep. 104:20-105:1, Pl.'s Resp. Mot. Summ. J. Ex. I.)  Taylor later told the head of human resources, Ameena Ali, that she thought more was being made of the situation than should be, and that Plaintiff had not acted maliciously in making his statements during the meeting.  (*Id.* at 210:23-211:5.)

After the meeting, Plaintiff approached Wolfe and said that he had sensed that she was upset and "wanted to explain."  (Pl.'s Dep. 166:18-23.)  Wolfe said that she did not want to discuss the meeting.  (*Id.* at 167:2-8.)  Soon thereafter, Plaintiff was confronted by Joyce Evans, who was not present at the meeting but had been approached by several meeting attendees who had been offended by Plaintiff's remarks.  (Tyler Dep. 15:8-18; Evans Dep. 68:19-23, Pl.'s Resp. Mot. Summ. J. Ex. W.)  Evans informed Plaintiff that he had upset his coworkers, and Plaintiff decided to talk to each of the attendees individually.  (Pl.'s Dep. 174.)  Plaintiff spoke to John Jervay and explained his rationale for using the word during the meeting.  Jervay perceived this to be "some form of an apology."  (Jervay Dep 39:17-18, Def.'s Mot. Ex. 14, ECF No. 26-5.)  During the conversation with Jervay, Plaintiff again used the word once or twice.  (*Id.* at 39:1-18.)  Plaintiff had similar conversations with Christopher Denton, Cynthia Cappello, Charles Edmondson, and Tor Smith.  (Pl.'s Dep. 177:12-19.)  As with Jervay, Plaintiff used the word in several (though not all) of these conversations.  (*See, e.g.*, *id.* at 172:25-173:9, 185:6-14.)  After he explained himself and apologized to his coworkers, Plaintiff again spoke to Evans.  (Pl.'s Dep. 187:14-19.)  Plaintiff testified that during this conversation, "Joyce said, [b]ecause you're

white you can never understand what it's like to be called a nigger and that you cannot use the word 'nigger.'" (Pl.'s Dep. 188:18-23.) Evans denies telling Plaintiff that he could not say the word because he was white, and she also denies ever saying the word during her conversation with Plaintiff. (Evans Dep. 18:9-20.) Plaintiff testified that Evans used the word twice in their conversation. (Pl.'s Dep. 157:6-8.) Plaintiff told Evans that he was surprised at her position, because he did not believe that a journalist was not allowed to say certain words in an editorial context.[3] (*Id.* at 188:4-189:4.)

The conversation ended with Evans and Plaintiff in full disagreement. (*Id.* at 193:21-22.) Thereafter, Plaintiff overheard Evans telling another employee that "people get fired for using that word." (*Id.* at 194:2-6.) Plaintiff testified that at that point, he realized that "she was not letting this go." (*Id.* at 194:6-7.) On Sunday, June 24, Evans called the Assistant News Director, Leslie Tyler, at home to tell her about Plaintiff's actions at the previous day's newsroom editorial meeting. Tyler is African American. (Tyler Dep. 14:17-15:21, Pl.'s Resp. Mot. Summ. J. Ex. K, ECF No. 28.) Evans told Tyler that employees were upset over what Plaintiff had said during the meeting. (*Id.* at 15:8-18.) Evans felt that Tyler should know what had happened in the meeting and how people reacted to it. (*Id.*) Tyler called several employees that day to find out what had happened in the meeting. (*Id.* at 21:14-16.) Tyler testified that she believes that she called Nicole Wolfe, John Jervay, Tor Smith, Becky Rogers and Robin Taylor. (*Id.*) Plaintiff contends based on Taylor's and Rogers's deposition testimony that Tyler only called the African

---

[3] Ameena Ali, the head of Defendants' HR department, testified in her deposition that Evans's statement that white people could not say the word would be a violation of Defendants' EEO policies. (Ali Dep. 109:11-110:3.)

American employees who were present at the meeting.[4]  (Pl.'s Resp. Mot. Summ. J. 16-17.)

Defendants dispute this, pointing out that Tyler and/or Ali eventually spoke to Christopher

Denton, who is white, and several other white employees who attended the meeting.  (Def.'s

Reply 29-30.)  In any event, the record shows that on Sunday, June 24, 2007, Tyler called all the

African American employees who had been present at the meeting but had not called the

majority of the white attendees, including Plaintiff himself.

On Monday, June 25, Tyler spoke to the News Director at the Station, Philip Metlin,

about the June 23 meeting and its aftermath.  Metlin is a white male.  (Tyler Dep. 26:23-27:18.)

Tyler had intended to inform Ameena Ali about the situation, but Metlin told Tyler not to contact

Ali or to do anything else at that juncture.  (*Id.* at 28:6-12, 31:4-17.)  Over the following few

days, Tyler received emails from several of the people whom she had called the previous

Sunday.  Tor Smith sent an email to Tyler and Metlin on Wednesday, June 27.  (Smith Dep.

24:16-17, Pl.'s Resp. Mot. Summ. J. Ex. T.)  Joyce Evans had recommended that Smith speak to

Tyler about his discomfort with Plaintiff's comments.  Tyler in turn recommended that Smith

detail his complaint about Plaintiff in an email to Tyler and Metlin.  (*Id.* at 31:1-24.)  Smith's

email details his version of Plaintiff's remarks during and after the June 23 meeting.  (Def.'s

Mot. Ex. 16, ECF No. 26-6.)  Nicole Wolfe also wrote an email to Metlin and Tyler, as did

Becky Rogers.  (*Id.* Ex. 17; Ali Dep. 200:22-201:8.)  In addition, John Jervay sent an email

---

[4] Becky Rogers stated in her deposition that she first spoke to Tyler about the incident in Tyler's office later in the week—not on the phone on Sunday, June 24, as Tyler testified.  (*See* Rogers Dep. 90:7-20, Pl.'s Resp. Mot. Summ. J. Ex. L, ECF No. 28.)  Similarly, Robin Taylor testified that she did not talk to anyone about the incident until "days later.  Probably a week later."  (Taylor Dep. 90:21-25.)  This contradicts Tyler's testimony that she called Taylor on Sunday, June 24.  We must not resolve factual issues, but we must view the facts and the inferences in the light most favorable to the Plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

describing Plaintiff's actions to Metlin and Tyler.  Jervay's email explicitly uses the word "nigger" three times, twice in all capital letters.  (Def.'s Mot. Ex. 18, ECF No. 26-6.)

Becky Rogers wrote her email to Metlin and Tyler after a conversation with Joyce Evans in which Evans asked Rogers how she felt about Plaintiff's behavior at the meeting.  Rogers said that she was "horrified."  (Rogers Dep. 102:23-103:3.)  Evans said that it was important that Rogers let management know how she felt because "[t]he only people who have complained so far have been black people."  (*Id.* at 103:6-16.)  Rogers said that she would think about it.  (*Id.* at 104:14-16.)

At this point, Metlin brought the issue to Mike Renda, the General Manager of the station.  Renda is a white male.  (Renda Dep. 20:7-21:11, Pl.'s Resp. Mot. Summ. J. Ex. J, ECF No. 28.)  Renda ordered Ameena Ali to conduct an investigation into Plaintiff's actions.  (*Id.* at 21:14-24:7.)  As part of that investigation, Ali asked Plaintiff to participate in a meeting with her, Metlin, and Renda on June 29, 2007.  (Def.'s Mot. Ex. 24.)  During the meeting, Metlin asked Plaintiff to give his version of the events at the editorial meeting the previous Saturday.  (*Id.*)  Plaintiff recited what he had said in the editorial meeting, using the word in the process.  (*Id.*; Ali Dep. 146:14-147:13.)  Ali responded, "Tom, you're still saying the word, why are you doing that?"  (Ali Dep. 148:21-149:3; *see also* Pl.'s Dep. 214:14-23 ("Ms. Ali cut me off and said, 'I can't believe you said it again. . . . Don't you know you can't use that word?'").)  Plaintiff replied that he was simply relating what had happened at the editorial meeting, as Metlin had requested.  (Pl.'s Dep. 214:25-215:3.)  Ali testified that she found Plaintiff's use of the word during the meeting offensive.  (Ali Dep. 149:12-15.)  Metlin, who is Jewish, explained to Plaintiff that his use of the word was akin to calling someone a "kike."  (Metlin Dep. 155:7-20.)  Metlin told Plaintiff that he would be suspended pending an investigation, and the meeting ended

abruptly.  (Pl.'s Dep. 216:17-19.)  The entire meeting lasted about five minutes.  (*Id*. at 214:11.)

Plaintiff did not have an opportunity to give his version of the events that occurred after the

editorial meeting, including his apologies to coworkers.  (*Id.* at 213:15-20.)

Plaintiff was never asked to explain his side of the story during the subsequent

investigation.  (Ali Dep. 185:16-187:3.)  Plaintiff emailed Metlin on June 30 requesting an

"opportunity to allow you to assess my sincerity by speaking with you face-to-face so you can

hear what is in my head and in my heart."  (Pl.'s Resp. Mot. Summ. J. Ex. EE.)  Plaintiff never

received a response from Metlin.  (Pl.'s Resp. Mot. Summ. J. Ex. X at 5.)  As part of the

investigation, Ali spoke to Cyndi Cappello, Nicole Wolfe, and Robin Taylor.[5]  (Ali Dep. 212:22-

213:13.)  Ali did not speak to Plaintiff during the course of the investigation.  (*Id.* at 185:16-

187:4.)  Nor did Ali inquire as to whether the employees who had attended the June 23rd

editorial meeting had reacted to Plaintiff's comments the way they did because of Plaintiff's

race.  (*Id.* at 108:23-109:6.)

The investigation concluded on July 3, 2007.  (Pl.'s Resp. Mot. Summ. J. Ex. JJ.)

Plaintiff was issued a memorandum entitled "Final Warning and Employee Assistance Program

Referral."  (*See id.*)  The memorandum briefly described the events that had led to Plaintiff's

suspension and informed Plaintiff that "[y]our behavior was unacceptable and will not be

tolerated.  You will not be warned again.  Further failure to meet the job performance standards

of your position will result in the immediate termination of your employment."  (*Id.*)  It referred

Plaintiff to sensitivity training and stated that Plaintiff's failure to contact the Employee

Assistance Program ("EAP") to schedule the sensitivity training, or to follow its

---

[5] Ali's testimony that she spoke with Robin Taylor as part of her investigation is in
conflict with Taylor's testimony that Ali did not speak to her.  (*Compare* Ali Dep. 212:22-
213:13, *with* Taylor Dep. 106:9-12.)

recommendations, would be interpreted as a refusal to cooperate.  (*Id.*)  According to Plaintiff, Mike Renda told Plaintiff at about this time that they were "going to ride this one out," and that Plaintiff would be reinstated if he complied with the EAP's requirements.  (Pl.'s Dep. 224:4-7.) Phil Metlin testified that at this point Defendants had most likely not yet decided to terminate Plaintiff, as they would not have given a final warning to an employee whom they had decided to terminate.  (Metlin Dep. 259:5-8.)

On July 5, 2007, the Philadelphia Daily News published an article about Plaintiff's suspension in which it stated that "FOX 29 anchor/reporter Tom Burlington has been suspended by the station following what sources describe as a 'bizarre' and 'shocking' sermon in which he insisted there's nothing wrong with a word most commonly referred to as 'the N-word.'"  Dan Gross, *Fox's Tom Burlington suspended*, Phila. Daily News, July 5, 2007.  The article stated that Plaintiff had "used the word more than a dozen times as he argued that doing so was not such a big deal."  *Id.*  Plaintiff called the article "false and defamatory" and suggested that the source of the Daily News's information was a coworker who wanted to end Plaintiff's career.  (Pl.'s Resp. Mot. Summ. J. Ex. X at 4; Pl.'s Dep. 264:2-8.)  The Philadelphia Tribune picked up the story the following day, running a front-page article with Plaintiff's picture.  Larry Miller, *Fox news anchor suspended—reports say journalist used the 'n-word'*, Phila. Trib., July 6, 2007, at 1A. The story was subsequently picked up by several other print and online media outlets.  (*See generally* Def.'s Mot. 13 (citing news articles).)

The Daily News article attributes its information about the June 23 editorial meeting to Plaintiff's colleagues at the Station.  *See* Gross, *supra*.  Phil Metlin acknowledged that leaking information about the editorial meeting would be a violation of the Station's policies.  (Metlin Dep. 180:2-6.)  Mike Renda testified that if he learned of a Station employee leaking this story to

the press, the employee most likely would have been terminated.  (Renda Dep. 77:10-78:24.)
The Station did not conduct an investigation to determine whether one of its employees had
leaked the story to the media.  (Renda Dep. 85:4-10.)

The Station's management began to receive requests from employees that they not be
assigned to work with Plaintiff.  Photographer Paxton Reese emailed Chief Photographer John
Campbell with a request that he not be assigned to work with Plaintiff.  (Defs.' Mot. Summ. J.
Ex. 27.)  Paxton Reese is African American.  Mike Renda testified that other photographers
requested that they not be assigned to work with Plaintiff because they were concerned for their
safety if they appeared on the street with Plaintiff.  (Renda Dep. 172:21-173:6.)

In the meantime, Plaintiff complied with the EAP's requirements.  (Ali Dep. 249:6-20.)
On July 6, 2007, the EAP informed Ali that Plaintiff was fit to return to work.  (*See* Pl.'s Resp.
Mot. Summ. J. Ex. MM (stating that Plaintiff was "in compliance" and was fit to return to work,
and that "[h]e feels very badly and is remorseful about what happened").)  Ali forwarded the
email to Mike Renda.  (*See id.*)  On July 9th, Renda replied to Ali's email, stating, "[w]e need to
talk about return scenario—news would like him to return Wed."  (Pl.'s Resp. Mot. Summ. J. Ex.
NN.)

Joyce Evans called Ameena Ali on July 10th to inform her that she was receiving phone
calls from the National Association of Black Journalists ("NABJ") and the Philadelphia
Association of Black Journalists ("PABJ") regarding Plaintiff's behavior at the editorial meeting.
(Pl.'s Resp. Mot. Summ. J. Ex. OO.)  Evans also told Ali that she was hearing a lot of comments
from "people talking to [her] on the street" about Plaintiff's use of the word during and after the
editorial meeting.  (Evans Dep. 138:18-21.)  Evans testified that she received a lot of phone calls
asking if she was okay, as well as a voicemail from the NABJ and a voicemail from the PABJ.

(*Id.* at 137:13-138:21.)  Evans did not actually talk to anyone at the NABJ or the PABJ, and she could not provide the name of anyone who had spoken to her regarding Plaintiff's behavior.  (*Id.* at 137:7-140:12.)  Ali testified that she believed Evans had called her to ask for advice on how to respond to these inquiries.  (Ali Dep. 301:10-18.)  Evans also told Ali that she was concerned about her on-air chemistry with Plaintiff in light of Plaintiff's actions.  (*Id.* at 301:19-21.)  Ali testified that she did not believe that Evans was trying to prevent Plaintiff from returning to work.  (*Id.* at 302:23-303:5.)  Upon viewing Ali's notes from the phone call with Evans, which read, "Getting lots of calls / NABJ / PABJ / People on street / Was concerned about the chemistry if Tom comes back," Phil Metlin agreed that there was a racial issue regarding Plaintiff's comments.  (Metlin Dep. 255:10-14 ("Q: As you read [Ali's notes], is this document indicating to you that there's a racial issue concerning Mr. Burlington's comments?  A: Yes.").)

On July 12, 2007, Mike Renda, Ameena Ali, and Phil Metlin met with Plaintiff and informed him that he would not be put back on the air, and that his contract would not be renewed when it expired.  (Pl.'s Dep. 244:23-245:6.)  Renda testified that the Station could have fired Plaintiff for cause, stating that the adverse publicity resulting from Plaintiff's behavior violated the clause in Plaintiff's contract that prevented him from engaging in "any activity that may result in adverse publicity or notoriety for performer or company."  (Renda Dep. 199:1-5.)  Nevertheless, Renda offered Plaintiff the opportunity to resign, believing it to be the right thing to do.  (*Id.* at 195:18-196:2.)  Plaintiff told Renda, Metlin, and Ali that it would ruin his career if they terminated him, but Metlin assured Plaintiff that he would "come through this without any problems."  (Pl.'s Dep. 245:20-246:5.)  Renda explained that their concern for Plaintiff's safety was the basis for his decision.  Plaintiff was unable to elicit any further explanation.  (*Id.* at 245:9-19.)  No one stated that Plaintiff's race was the reason for his termination, and Plaintiff did

not suggest as much during the meeting.  (*Id.* at 248:2-12.)  Plaintiff never returned to work at

the Station, though the Station paid Plaintiff through the end of his contract, which expired on

February 19, 2008.  (*Id.* at 247:18-25, 64:21-65:1.)  Since his contract with Fox expired, Plaintiff

has been unable to obtain a job as a journalist.  (*Id.* at 100:14-23.)  He was able to get a job

working as a real-estate agent.  (*Id.* at 33:20-21.)

### B.     Procedural History

Plaintiff filed a complaint against Defendants on May 4, 2009, alleging race

discrimination and hostile work environment in violation of Title VII and the PHRA.

Defendants filed a Motion for Summary Judgment on Plaintiff's discrimination and hostile work

environment claims on August 31, 2010.  (*See* Defs.' Mot. Summ. J., ECF No. 26.)  We granted

Defendants' Motion with regard to Plaintiff's hostile work environment claim and denied the

Motion with regard to Plaintiff's discrimination claim.  *See Burlington*, 759 F. Supp. 2d 580.  In

denying the Motion for Summary Judgment on Plaintiff's discrimination claim, we relied in part

on what has become known as the "cat's paw" theory of liability.[6]  Cat's paw liability applies

when a member of a protected class is subjected to an adverse employment action by a

decisionmaker who is himself free of discriminatory animus, but whose actions are influenced by

other employees who are motivated by discriminatory animus.  Defendants in the instant case

argued that, independent of the actions or motivations of Plaintiff's coworkers, there was no

evidence that the supervisor who ultimately decided to terminate Plaintiff's employment, Mike

---

[6] The term "cat's paw," which is derived from a fable by Jean de La Fontaine, was introduced into the legal lexicon by Judge Posner in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).  In the fable, a monkey persuades a cat to remove chestnuts from a fire on which they are roasting.  Once the cat has done so, the monkey grabs the chestnuts and eats them, leaving the cat with only a burnt paw for its efforts.  *See Staub v. Proctor Hosp.*, 562 U.S. __, 131 S. Ct. 1186, 1190 n.1 (2011).  Twelve years after he introduced the term, Judge Posner noted that the "fable [is] offensive to cats and cat lovers" and called the cat's paw theory of liability "a judicial attractive nuisance."  *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).

Renda, harbored discriminatory motivations in terminating Plaintiff.[7]  In finding that Defendants could be subject to liability, we relied in part on the Third Circuit's formulation of cat's paw liability in *Abramson v. William Paterson College of New Jersey*, which held that even if the decisionmaker does not himself harbor discriminatory animus, "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate."  260 F.3d 265, 286 (3d Cir. 2001).

Defendants immediately submitted a Motion for Stay Pending the Supreme Court's Decision in *Staub v. Proctor Hospital* and/or for Reconsideration.  (*See* Defs.' Mot. Reconsider., ECF No. 50.)  In their Motion for Reconsideration, Defendants pointed out that a case involving cat's paw liability was presently before the Supreme Court and requested that we stay our opinion denying summary judgment on Plaintiff's discrimination claim until the Supreme Court issued its opinion in *Staub*.  (*See id.* at 2-5.)  We agreed that the Supreme Court's opinion in *Staub* would likely affect the course of this litigation and stayed our opinion in anticipation of the Supreme Court's ruling.  *See Burlington v. News Corp.*, No. 09-1908, 2011 WL 79777, at *2-3 (E.D. Pa. Jan. 10, 2011).

The Court handed down its opinion in *Staub* on March 1, 2011, after which the parties submitted briefs analyzing the effect of *Staub* on our summary-judgment opinion and Defendants' Motion for Reconsideration.  We maintained the stay pending the resolution of a separate litigation arising out of these events.  That action has concluded, and the matter is now ripe for disposition.

---

[7] We did not entirely agree with Defendants' characterization of Renda as free of discriminatory animus.  *See Burlington*, 759 F. Supp. 2d at 594-595 (discussing Renda's inability to explain why Burlington had been suspended for repeating what he had said in the meeting while an African American employee had not been disciplined for similar conduct).

## II.     DISCUSSION

The plaintiff in *Staub* was an angiography technician who was employed by the defendant, Proctor Hospital.  *Staub*, 131 S. Ct. at 1189.  Staub also served in the United States Army Reserve.  *Id.*  There was evidence in the record that two of Staub's supervisors were hostile to his military obligations.  This evidence included assertions by Staub's supervisors that his military service was a "waste of taxpayers['] money" and "had been a strain on th[e] department," and testimony that one of the supervisors had asked a coworker to help "get rid of" Staub.  *Id.*  One of the supervisors issued Staub a "corrective action" disciplinary warning for purportedly violating a rule that forbid him from leaving his work area without notifying his supervisors.  The corrective action included a requirement that Staub inform his supervisors if he was going to leave his work area.  A few weeks later, Staub's supervisor informed Proctor's vice-president of human resources, Linda Buck, that Staub had again left his work area without notice.  After reviewing Staub's personnel file, Buck fired him.  *Id.*  Staub challenged the decision, arguing that the rule requiring him to stay near his work area did not exist, and that even if it did, he had left a voicemail for his supervisors informing them that he would be away from his work area.  Buck refused to reverse her decision.

Staub sued under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301, *et seq*., claiming that his termination was motivated by hostility to his obligations as a military reservist.  *Id.* at 1190.  Although Staub conceded that there was no evidence that Buck harbored anti-military animus, he argued that his supervisors were motivated by hostility to his military obligations when they supplied negative information to Buck that ultimately caused his termination.  *Id.*  A jury found in favor of Staub and awarded him $57,640 in damages.  The Seventh Circuit reversed, holding that Proctor was entitled to

14

judgment as a matter of law.  *Id.*  The Court of Appeals found that under Seventh Circuit

precedent, "a cat's paw case could not succeed unless the biased supervisor exercised such

singular influence over the decisionmaker that the decision to terminate was the product of blind

reliance." *Id.* (quoting *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009)) (internal

quotation marks omitted).  Staub petitioned for certiorari.

The Supreme Court reversed.  The Court reasoned that as a congressionally created tort,

USERRA should be interpreted against the background of tort and agency law.  *Id.* at 1191.

Applying principles of agency and tort law, the Court unanimously concluded that "if a

supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to

cause an adverse employment action, and if that act is a proximate cause of the ultimate

employment action, then the employer is liable under USERRA."  *Id.* at 1194.  The Court

determined that the evidence was sufficient to show that Staub's supervisors were hostile to his

military obligations, and that they intended for their actions to result in Staub's termination.  *Id.*

The opinion also noted that the two supervisors who had allegedly harbored discriminatory

motivations "were acting within the scope of their employment when they took the actions that

allegedly caused Buck to fire Staub."  *Id.*  Critically, the Court commented that:

> the employer would be liable only when the supervisor acts within the scope of
> his employment, or when the supervisor acts outside the scope of his employment
> and liability would be imputed to the employer under traditional agency
> principles.  *We express no view as to whether the employer would be liable if a
> co-worker, rather than a supervisor, committed a discriminatory act that
> influenced the ultimate employment decision.*

*Staub*, 131 S. Ct. at 1194 n.4 (emphasis added, citations omitted).  We must therefore determine

whether *Staub* applies when the offending employee is not a supervisor.

As a preliminary matter, we conclude that although *Staub* addressed cat's paw liability

within the context of USERRA, the Supreme Court's analysis applies to Title VII cases as well.

Neither party argues otherwise, and other courts that have considered the issue have either explicitly or implicitly concluded that the analysis in *Staub* applies to Title VII cases.  *See, e.g.*, *Gollas v. Univ. of Tex. Health Science Ctr. at Hou.*, 425 F. App'x 318, 325-27 (5th Cir. May 12, 2011) (per curiam) (non-precedential) (applying *Staub*'s cat's paw analysis to Title VII retaliation case); *Cook v. IPC Int'l Corp.*, No. 09-0275, 2011 WL 2173719, at *3-7 (S.D. Ill. June 2, 2011) (noting similarities in language of USERRA and Title VII and applying *Staub* to Title VII case), *rev'd on other grounds*, 673 F.3d 625 (7th Cir. 2012); *Baldwin v. Holder*, No. 09-0842, 2011 WL 2078614, at *11 (S.D. Tex. May 26, 2011) (citing several cases that apply *Staub* to Title VII actions).  Indeed, the Supreme Court itself noted that USERRA's "motivating factor" statutory language "is very similar to Title VII."  *Staub*, 131 S. Ct. at 1191.  We therefore conclude that the cat's paw analysis set forth by the Supreme Court in *Staub* applies equally to an action for discrimination under Title VII.

### A.    Whether Cat's Paw Liability Attaches When the Employee Exhibiting Discriminatory Animus Is Not a Supervisor

Determining whether *Staub*'s holding extends liability to the acts of nonsupervisory coworkers on a cat's paw theory requires not just an analysis of *Staub* itself, but also of the Supreme Court's more recent decision in *Vance v. Ball State University*, __ U.S. __, 133 S. Ct. 2434 (2013).  The interplay between these two cases provides some insight into how the Supreme Court would address the issue.

An employer's liability for workplace harassment under Title VII often depends on the status of the harasser.  "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a 'supervisor,' however, [and the] harassment culminates in a tangible employment action, the

16

employer is strictly liable." *Vance*, 133 S. Ct. at 2439. *Vance* answered the question of who qualifies as a "supervisor" for purposes of harassment claims under Title VII.

In *Vance*, Plaintiff Maetta Vance, an African American woman, was hired as a catering assistant by the defendant. During the course of her employment Vance lodged several complaints of racial discrimination against Saundra Davis, a white female coworker. It was undisputed that "Davis did not have the power to hire, fire, demote, promote, transfer, or discipline Vance." *Vance*, 133 S. Ct. at 2439. Vance subsequently filed a lawsuit against her employer alleging a racially hostile work environment in violation of Title VII on the theory that Davis was her supervisor. The district court entered summary judgment in favor of the defendant, reasoning that the defendant was not vicariously liable for Davis's actions because Davis was not Vance's supervisor. The Seventh Circuit affirmed, and the Supreme Court granted certiorari.

The Supreme Court affirmed the Seventh Circuit's decision, holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 2454. Finding "no evidence that [the defendant] empowered Davis to take any tangible employment actions against Vance," *id.*, the Court concluded that Davis was not a supervisor for purposes of Title VII.

The tension between *Vance* and *Staub* is apparent: if *Staub* limits liability on a cat's paw theory to supervisors, as Defendants urge, and *Vance* limits the supervisor designation to employees who are empowered to take tangible employment action (such as hiring and firing), then there is no longer any circumstance in which liability can be predicated on a cat's paw theory. If the discriminating employee has the power to fire the Title VII plaintiff, he is a supervisor under *Vance*. However, there would be no need for the employee to convince

someone else to fire the plaintiff.  If the discriminating employee has no power to fire the

plaintiff, then he is not a supervisor and cat's paw liability is unavailable.  *Vance* would appear at

first blush to do away with the cat's paw theory of liability.

Since we do not believe that the Supreme Court would abrogate a unanimous, two-year-

old opinion without any indication that it was doing so, we must determine how to reconcile

*Vance* with *Staub*.  The answer finds its support in *Vance* itself.  Writing for the majority, Justice

Alito addressed the dissent's criticism that the majority's definition of "supervisor" would

encourage employers to insulate themselves from liability by concentrating the power to take

tangible employment actions in a few individuals who rely on information from other employees

who actually work with the aggrieved employee:

> [E]ven if an employer concentrates all decisionmaking authority in a few
> individuals, it likely will not isolate itself from heightened liability under
> *Faragher* and *Ellerth*. If an employer does attempt to confine decisionmaking
> power to a small number of individuals, those individuals will have a limited
> ability to exercise independent discretion when making decisions and will likely
> rely on other workers who actually interact with the affected employee.  Under
> those circumstances, the employer may be held to have effectively delegated the
> power to take tangible employment actions to the employees on whose
> recommendations it relies.

*Vance*, 133 S. Ct. at 2452 (citations omitted).  In *Kramer v. Wasatch County Sheriff's Office*, 743

F.3d 726, 738 (10th Cir. 2014), the Tenth Circuit seized on this language as a way to reconcile

*Vance* with *Staub*.  We likewise conclude that this is the appropriate analysis for reconciling the

two cases.

This conclusion is consistent with the agency-law underpinnings of the Supreme Court's

Title VII decisions.  The Supreme Court's Title VII jurisprudence has insisted that Title VII be

interpreted with reference to agency law—specifically, the Restatement (Second) of Agency.

*See, e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ("Congress has directed

federal courts to interpret Title VII based on agency principles."); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (noting that "Congress wanted courts to look to agency principles for guidance" in Title VII cases); *Faragher v. City of Boca Raton*, 524 U.S. 775, 791 (1998) ("[T]he very definition of employer in Title VII, as including an 'agent,' expressed Congress's intent that courts look to traditional principles of the law of agency in devising standards of employer liability . . . ." (citations omitted)).  Indeed, in drawing the line between supervisors and employees for the purpose of holding employers vicariously liable for sexual harassment, the Court rested its conclusion on a thorough analysis of Restatement (Second) of Agency § 219 (1957).  *Ellerth*, 524 U.S. at 758-65.

> Section 219 states that:
>
> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> > (a) the master intended the conduct or the consequences, or
> >
> > (b) the master was negligent or reckless, or
> >
> > (c) the conduct violated a non-delegable duty of the master, or
> >
> > (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

Restatement (Second) of Agency § 219.  In *Ellerth*, the Court noted that "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment."  524 U.S. at 757.  Therefore, to hold an employer vicariously liable for the sexual harassment of a supervisor, the conduct must satisfy one of the four exceptions to § 219(1) found in § 219(2).  The Court concluded that neither subsections (a) nor (c) applied, meaning that vicarious liability

must be predicated upon either the negligence or recklessness of the employer, as stated in subsection (b), or the "aided in the agency relation" exception found in subsection (d). *Id.* at 758.

Focusing on the aided in the agency relation standard, the Court observed that "[i]n a sense, most workplace tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation:  Proximity and regular contact may afford a captive pool of potential victims." *Id.* at 760.  However, allowing the mere fact of employment to satisfy the aided in the agency relation exception would "subject [employers] to vicarious liability not only for all supervisor harassment, but also for all co-worker harassment, a result enforced by neither the EEOC nor any court of appeals to have considered the issue." *Id.*  Recognizing that the aided in the agency relation exception therefore required "the existence of something more than the employment relation itself," *id.*, the Court concluded that vicarious liability would apply "[w]hen a supervisor makes a tangible employment decision, [because] there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 761.  Such cases fall squarely within § 219(2)(d)'s exception permitting vicarious liability to attach when an agent acts outside the scope of his employment.

We recognize that the Supreme Court's use of the Restatement (Second) of Agency § 219 to interpret Title VII has largely been limited to hostile work environment cases. Nevertheless, we see no reason why it should not apply with equal force to an action for discriminatory termination.  The First Circuit's decision in *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 273 (1st Cir. 2014), supports this view.  In *Velazquez-Perez*, the court observed that the "[Supreme] Court has cautioned . . . that the distinction between hostile workplace claims and quid pro quo claims is 'of limited utility.'" *Id.* (quoting

*Ellerth*, 524 U.S. at 751).  The First Circuit went on to apply the negligence regime established

for hostile work environment cases to a wrongful termination case involving cat's paw liability,

reasoning that there was "no basis for applying that distinction to permit a negligent employer to

escape (or incur) liability on one type of claim but not the other."  *Id.*  We agree, and we

therefore look to the agency-law principles underlying the Supreme Court's decisions in *Ellerth*,

*Staub*, and *Vance* for guidance.

According to the Court in *Staub*, the plaintiff's supervisors "were acting within the scope

of their employment when they took the actions that allegedly caused Buck to fire Staub."  131

S. Ct. at 1196.  Given the Court's reliance on § 219(1) of the Restatement, which makes

employers vicariously liable for the torts of employees acting within the scope of their

employment, we see no reason why the exceptions of § 219(2) would not apply in cases

involving cat's paw liability for discriminatory termination.  As in *Ellerth*, we conclude that

liability is appropriate on a cat's paw theory where a biased employee acts outside the scope of

her employment and either (1) the employer was negligent or reckless, or (2) the biased

employee was aided in accomplishing the tort by the existence of the agency relation.

Restatement (Second) Agency §§ 219(2)(b), (d); *see also Ellerth*, 524 U.S. at 758-63 (analyzing

distinction between supervisors and ordinary employees under Restatement § 219(2) and

concluding that "there are acts of harassment a supervisor might commit which might be the

same acts a coemployee would commit, and there may be some circumstances where the

supervisor's status makes little difference").

This approach is consistent with *Vance*'s suggestion that an employer can delegate the

power to take tangible employment actions to nonsupervisory employees so that the employer

could be vicariously liable for the employees' actions.  Such a delegation falls within the aided in

the agency relation exception of §219(2)(d) so that it is reasonable to hold the employer liable for the actions of a nonsupervisory coworker to whom such authority is delegated.

Plaintiff and Defendants each advance their own views as to whether an employer can be vicariously liable for a coworker's discriminatory animus on a cat's paw theory.  Neither argument is persuasive.  Plaintiff argues that because the Court declined to express a view on whether a non-decisionmaking coworker's improper motivation can subject his employer to liability under Title VII, the Third Circuit's holding in *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001), still controls when it is a coworker's actions that are at issue rather than a supervisor's, and our summary-judgment opinion therefore must stand unaltered.  (Pl.'s Supp. Br. 9-12.)  We disagree.  As noted by a panel of the Third Circuit Court of Appeals in *McKenna v. City of Philadelphia*, 649 F.3d 171, 180 (3d Cir. 2011), the standard for cat's paw liability set forth in *Abramson* omits the proximate cause requirement articulated by the Supreme Court in *Staub*.  *See id.* (recognizing that *Abramson* "did not explicitly characterize the applicable test as one of proximate cause").  *Abramson* held that "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." 260 F.3d at 286.  By contrast, *Staub* requires that the biased employee act with the *intent* to cause an adverse employment action, and that the employee's actions be a *proximate cause* of the adverse employment action.  131 S. Ct. at 1194.  *Staub* sets forth a more demanding standard than *Abramson*'s formulation of cat's paw liability.  We doubt that the Supreme Court, having determined that both intent and proximate causation are required for cat's paw liability to attach based on a supervisor's discriminatory actions, would apply a less demanding standard when the biased employee is a coworker rather than a supervisor.  Indeed, the Third Circuit's decision in *McKenna* suggests that *Abramson*'s formulation of cat's paw liability is no longer good law in

light of *Staub*.  *See McKenna*, 2011 WL 3606834, at *7 ("*Staub* . . . was not the law in effect at

the time the jury was instructed or at the time that the District Court rendered its decision.

Rather, it was this court's decision in *Abramson* that was controlling.").  Plaintiff's argument that

*Staub* left *Abramson* undisturbed in cases involving coworkers would require courts to cast a

broader net in cat's paw cases involving coworkers than in cases involving supervisors.  We do

not believe this is an appropriate result in light of *Staub*.

      Defendants argue that for cat's paw liability to attach under *Staub*, the subordinate whose

bias is sought to be attributed to the employer must be a supervisor.  (Defs.' Supp. Br. 3-4, ECF

No. 64.)  In discussing the basis for holding employers liable for the actions of a biased, non-

decisionmaking employee, the Supreme Court explained that "[t]he employer is at fault because

one of its agents committed an action based on discriminatory animus that was intended to cause,

and did in fact cause, an adverse employment decision."  *Staub*, 131 S. Ct. at 1193.  By

interpreting the antidiscrimination statutes in general and cat's paw liability in particular against

the backdrop of tort and agency law, the Supreme Court incorporated the common-law agency

principle that an employer is liable only for the torts of an agent acting within the scope of his

employment.  *See id.* at 1194 n.4 ("Needless to say, the employer would be liable only when the

supervisor acts within the scope of his employment, or when the supervisor acts outside the

scope of his employment and liability would be imputed to the employer under traditional

agency principles."); *id* at 1194 (noting that both supervisors were acting within the scope of

their employment when they took the actions that resulted in Staub's termination).

      Defendant takes this analysis one step further, however, arguing that *Staub* does not

permit cat's paw liability to attach when the biased subordinate is not a supervisor because only

supervisors can be agents.  (*See, e.g.*, Defs.' Supp. Br. 4 ("If the biased subordinate is not a

supervisor, but only a co-worker, and is thus not an agent of the employer, her actions and intentions are legally irrelevant because they are not legally attributable to any delegated authority of the employer."); *id.* at 7 ("[T]he law does not allow the actions of non-supervisors to be legally attributed to the employer.  As a result, in explaining the rationale behind the 'cat's paw' theory of employer liability, the Supreme Court speaks solely in terms of a biased supervisor and his or her actions and intentions." (emphasis in original)); Defs.' Supp. Resp. 1, ECF No. 66 ("*Staub*'s rationale precludes application of the 'cat's paw' theory of liability to non-supervisor coworkers . . . because they are not agents of the employer.").)  However, the Supreme Court has never endorsed such a bright-line approach to determining who is an agent of an employer.  To the contrary, the Supreme Court has applied agency law with reference to the Restatement (Second) of Agency's definition of an agent, stating that "the common-law element of control is the principal guidepost that should be followed."  *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003).

Defendants also argue that a coworker cannot be an agent of the employer because coworkers do not have authority to fire another employee.  But the supervisors in *Staub* did not have authority to fire the plaintiff, which is why they complained to the ultimate decisionmaker instead.  Indeed, the entire *raison d'être* of cat's paw liability is that the biased subordinate lacks the power to fire another employee unilaterally and must therefore convince a superior to do so.  A rule that only permits cat's paw liability to attach if the biased employee has the authority to fire others would in most cases defeat the purpose of cat's paw liability.

We are satisfied that Plaintiff here can establish a genuine issue of material fact on a cat's paw theory of liability if he establishes that one or more of his nonsupervisory coworkers: (1) performed an act motivated by discriminatory animus; (2) the act was intended by the

coworker to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action, *Staub*, 131 S. Ct. at 1194; and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation, *Velazquez-Perez*, 753 F.3d at 274; or (b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation.  Restatement (Second) of Agency § 291(2)(d); *Ellerth*, 524 U.S. at 758-63.

### 1.   *Act Motivated by Discriminatory Animus*

Applying this framework, Plaintiff has established a genuine issue of material fact on his wrongful-termination claim.  The evidence shows that Joyce Evans[8] acted with discriminatory animus in the wake of the editorial meeting at which Plaintiff used the word.  Her actions were based on her belief that there are certain words that African Americans can use in the workplace, but not whites—a belief that appears to have been shared by Plaintiff's coworkers, and even management.  (*See* Pl.'s Dep. 188:18-23 ("Joyce said, [b]ecause you're white you can never understand what it's like to be called a nigger and that you cannot use the word 'nigger.'"); Metlin Dep. 155:7-20 (explaining that because Plaintiff was not Jewish, he could not use the word "kike").)  In our summary-judgment opinion, we rejected the idea that because modern social norms permit African Americans to use the word but not whites, an adverse employment action that is grounded in this belief is not actionable under Title VII.  *See Burlington*, 759 F. Supp. 2d at 597 ("To conclude that the Station may act in accordance with the social norm that it is permissible for African Americans to use the word but not whites would require a

---

[8] Although we focus our analysis on Joyce Evans, who appears to have been the driving force behind Plaintiff's termination, we do not foreclose the possibility that the actions of other coworkers or supervisors could establish a genuine issue of material fact, either on a cat's paw theory or, in Mike Renda's case, a traditional theory.

determination that this is a 'good' race-based social norm that justifies a departure from the text of Title VII.  Neither the text of Title VII, the legislative history, nor the caselaw permits such a departure from Title VII's command that employers refrain from 'discriminat[ing] against any individual ... because of such individual's race.'" (citations omitted)).  Evans encouraged other coworkers to complain to management about Plaintiff, even urging a white coworker to do so because "[t]he only people who have complained so far have been black people."  (Rogers Dep. 103:6-16.)  We conclude that this is sufficient to establish a triable issue as to whether one or more of Plaintiff's coworkers' actions were motivated by discriminatory animus.  *Staub*, 131 S. Ct. at 1194.

### 2.   *Intent to Cause Plaintiff's Termination*

Similarly, the evidence supports the conclusion that Evans intended to cause Plaintiff's termination.  As the situation progressed, Plaintiff came to realize that Evans "was not letting this go."  (Pl.'s Dep. 194:2-6.)  Even after Plaintiff completed the EAP sensitivity training, which pronounced Plaintiff to be "in compliance" and noted that "[h]e fe[lt] very badly and [wa]s remorseful about what happened" (*See* Pl.'s Resp. Mot. Summ. J. Ex. MM), Evans continued to place phone calls to management regarding Plaintiff.  Given Plaintiff's compliance with the EAP program and his remorse over his actions, there was no reason for Evans's continued lobbying other than a desire to have Plaintiff terminated.

### 3.   *Proximate Cause*

The evidence also supports the conclusion that the actions of Joyce Evans were a proximate cause of Plaintiff's termination.  The evidence shows that management was preparing to put Plaintiff back on the air after his satisfactory completion of the EAP's requirements. Plaintiff received a "Final Warning," which Phil Metlin testified most likely would not have

happened if they had decided to terminate Plaintiff.  (Metlin Dep. 259:5-8.)  Meanwhile, Mike

Renda told Plaintiff that they were "going to ride this one out," and that Plaintiff would be

reinstated if he complied with the EAP's requirements.  (Pl.'s Dep. 224:4-7.)  After Plaintiff

satisfactorily completed the EAP requirements, Renda emailed Ameena Ali to inform her that

"[they] need[ed] to talk about return scenario—news would like him to return Wed."  (Pl.'s

Resp. Mot. Summ. J. Ex. NN.)  In other words, all signs pointed to Plaintiff returning to the air.

At this point, Joyce Evans intervened.  She called Ameena Ali to inform her that she was

receiving phone calls from the NABJ and the PAJB regarding Plaintiff's use of the word in the

workplace.  (Pl.'s Resp. Mot. Summ. J. Ex. OO.)  Evans also told Ali that she was hearing a lot

of comments from "people talking to [her] on the street" about Plaintiff's actions.  (Evans Dep.

138:18-21.)  Finally, Evans told Ali that she was concerned about her on-air chemistry with

Plaintiff in light of Plaintiff's actions.  (Ali Dep. 301:19-21.)  Two days later, Plaintiff was

informed that he would not be put back on the air and that his contract would not be renewed

when it expired.  (Pl.'s Dep. 244:23-245:6.)

Defendants' investigation of the incident does not sever the causal link between Evans's

actions and the final determination.  The evidence suggests that when Evans intervened, the

investigation was largely complete and the final determination made that Plaintiff would be put

back on the air.  The order of events precludes the argument that the investigation severed the

causal link between the discriminatory animus and the adverse employment action.[9]  Nor do

Defendants' arguments that Renda "thought about what he could do based on the information he

---

[9] Given our conclusion, we need not analyze the quality of Defendants' investigation to
determine if it was merely a "rubber stamp" for the adverse employment action.  Nevertheless,
we note that Plaintiff was not given an opportunity to defend himself (*see* Ali Dep. 185:16-
187:3; Pl.'s Resp. Mot. Summ. J. Ex. EE), and we are unaware of any evidence showing that
management relied on the results of the investigation when they terminated Plaintiff.  *See*
*McKenna*, 649 F.3d at 178-79 (describing investigation of plaintiff's actions and concluding that
there was a genuine issue of material fact on proximate causation in cat's paw action).

had independent of Ms. Evans" and "spoke with the Station's legal counsel" (Defs.' Supp. Resp.

5) suffice to break the chain of causation, as "it is common for injuries to have multiple

proximate causes." *Staub*, 131 S. Ct. at 1192.

These facts show that the intervention of Joyce Evans caused management to shift its

course from returning Plaintiff to the air to letting his contract expire. This raises a genuine issue

of material fact as to whether her actions establish a "direct relation between the injury asserted

and the injurious conduct alleged." *Staub*, 131 S. Ct. at 1192.

### 4.     *Vicarious Liability Under Restatement § 219(2)*

Finally, the evidence establishes that there is a triable issue of fact regarding vicarious

liability under the framework set forth in Restatement § 219(2) and the Supreme Court's

decisions in *Ellerth* and *Staub*. Under Restatement § 219(2)(d), an employer is vicariously liable

for the actions of an agent acting outside the scope of his employment if the agent is "aided in

accomplishing the [unlawful act] by the existence of the agency relation." Joyce Evans falls

squarely within this exception. As a weekend anchor on Fox 29, Evans is one of the most

influential journalists in Philadelphia. As such, this is not a case in which the employee whose

acts may form the basis for liability under Title VII is "analogous to a witness at a bench trial."

*Staub*, 131 S. Ct. at 1193; *see also Abdelhadi v. City of New York*, No. 08-0380, 2011 WL

3422832, at *4-5 (E.D.N.Y. Aug. 4, 2011), *aff'd sub nom. Abdelhadi v. New York City Dep't of

Correction*, 472 F. App'x 44 (2d Cir. 2012) (declining to hold city liable on cat's paw theory

where allegedly biased fellow police officers reported plaintiff's comments about wanting to

commit jihad to superiors). Nor was Evans aided in the agency relation solely in the sense that

her employment granted her "[p]roximity and regular contact" with Plaintiff. *Ellerth*, 524 U.S.

at 760. Rather, Evans clearly was "an actor in the events that are the subject of" this action.

*Staub*, 131 S. Ct. at 1193.  By placing Evans in the high-profile position of weekend anchor, Defendants granted her a level of influence, both at the workplace and in the community, that a nonsupervisory employee could not achieve in the absence of the agency relation.  It is consistent with *Ellerth*, *Staub*, and *Vance* to hold the employer vicariously liable if such a uniquely situated employee wields that influence to accomplish an end that is forbidden by Title VII.

Even if Evans did not fall within Restatement § 219(2)(d)'s aided in the agency relation exception, there is an issue of fact as to whether Defendants were negligent in terminating Plaintiff, as stated in § 219(2)(b).  As we noted above, Plaintiff was given no opportunity to defend himself during the investigation, even though he asked for the "opportunity to allow you to assess my sincerity by speaking with you face-to-face so you can hear what is in my head and in my heart."  (Pl.'s Resp. Mot. Summ. J. Ex. EE.)  There was no investigation as to who leaked information about Plaintiff's actions to the media, which resulted in the publicity that allegedly resulted in Plaintiff's termination.  (Renda Dep. 85:4-10.)  Nor does there appear to have been any further investigation between the time that management appeared ready to put Plaintiff back on the air and the time that they decided to terminate Plaintiff after days of lobbying by Evans. To the contrary, this appears to be a case in which management simply rubberstamped the desire of some of Plaintiff's coworkers (of whom Evans was the most visible) to see him terminated.

Management was clearly aware that Plaintiff's actions were being judged in light of the social norm that it is acceptable for African Americans to use the word, but not whites. Deposition testimony suggests that some supervisors even subscribed to this view themselves. (*See* Metlin Dep. 155:7-20.)  Accordingly, there is a triable issue of fact as to whether Defendants were negligent in permitting the discriminatory animus of one or more of Plaintiff's coworkers to influence their decision to terminate Plaintiff.

### III.      CONCLUSION

We are satisfied that there are genuine issues of material fact that render summary judgment inappropriate here.  For the foregoing reasons, Defendants' Motion for Reconsideration is denied.[9]

An appropriate Order follows.

BY THE COURT:

_____

R. BARCLAY SURRICK, J.

---

[9] Defendants' Motion for Stay Pending the Supreme Court's Decision in *Staub v. Proctor Hospital* and/or for Reconsideration raises additional aspects of our summary-judgment opinion that they believe to be incorrect, in addition to the cat's paw analysis.  (*See* Defs.' Mot. Reconsider. 9-23 (arguing that John Jervay and Dave Huddleston are not appropriate comparators).)  In so doing, Defendants largely repeat their arguments from their Motion for Summary Judgment.  "A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant."  *Abu-Jamal v. Horn*, No. 99-5089, 2001 WL 1609761, at *9 (E.D. Pa. Dec. 18, 2001) (citations and internal quotation marks omitted).  We addressed these issues in our summary-judgment opinion and will not consider them further here.