IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS BURLINGTON :
: CIVIL ACTION
v. :
: NO. 09-1908
NEWS CORPORATION, ET AL. :

**SURRICK, J.**                                                                        **JANUARY 12, 2015**

## MEMORANDUM

Presently before the Court is Defendants' Motion for Certification of This Court's Order Dated October 24, 2014, for Immediate Appeal Pursuant to 28 U.S.C. § 1292(b).  (ECF No. 71.)  For the following reasons, Defendants' Motion will be denied.

## I.    BACKGROUND

This is an action for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, *et seq.*, 28 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951, *et seq.*  Plaintiff Thomas Burlington, a white male, alleges that he was terminated by Defendants for using the word "nigger" in a non-pejorative manner during a newsroom editorial meeting, while African American employees were not punished for using the word in the workplace.  (Compl. ¶¶ 26-42, ECF No. 1.)

### A.    Factual Background

A full account of the facts in this case appears in our Memorandum dated October 24, 2014.  (ECF No. 67.)  To summarize, Thomas Burlington, a weekend anchor with Fox 29 News, was terminated after uttering a racial epithet during a production meeting in which a story about the NAACP's symbolic burial of the n-word was being discussed.  Burlington did not use the epithet pejoratively.  Station General Manager Mike Renda, a white male, ordered Human

Resources head Ameena Ali to conduct an investigation into the incident.  Accordingly, Ali convened a meeting during which she, Renda, and another supervisor asked Burlington to give his side of the story.  Burlington repeated the conversation from the production meeting, including the racial epithet he had used.  This brought the meeting to an immediate end, and Burlington was suspended.  An African American employee who was likewise asked to give an account of the discussion at the production meeting used the epithet several times in the email that he sent in response management's request.  He was not disciplined.

Initially, it did not appear that Burlington would lose his job over the incident.  He received a final warning and was referred to the Employee Assistance Program ("EAP") for sensitivity training.  Renda informed Burlington that they were "going to ride this one out," and that Burlington would be reinstated if he complied with the EAP's requirements.  (Pl.'s Dep. 224:4-7, Pl.'s Resp. Mot. Summ. J. Ex. A, ECF No. 28.)

Plaintiff has adduced evidence that after the incident in the production meeting, his co-anchor, Joyce Evans, an African American female, undertook a sustained behind-the-scenes campaign to get him fired.  Evans encouraged fellow employees to complain to management about Burlington, even going so far as to ask a white coworker to complain to management because "[t]he only people who have complained so far have been black people."  (Rogers Dep. 102:23-103:3, Pl.'s Resp. Mot. Summ. J. Ex. L.)  She also confronted Plaintiff, telling him that "[b]ecause you're white you can never understand what it's like to be called a nigger and . . . you cannot use the word 'nigger.'"  (Pl.'s Dep. 188:18-23.)  Eventually, news of Burlington's use of the racial epithet in the workplace was leaked to the media, and several Philadelphia newspapers printed the story.  Defendants made no attempt to discover the source of the leak, which remains unknown.

Burlington complied with the EAP requirements and was declared "in compliance" and fit to return to work.  Renda therefore wrote in an email that "[w]e need to talk about [Burlington's] return scenario—news would like him to return Wed."  (Pl.'s Resp. Mot. Summ. J. Ex. NN.)  At this point, Evans contacted Ali to inform her that she was receiving phone calls from the National Association of Black Journalists ("NABJ") and the Philadelphia Association of Black Journalists ("PABJ") regarding Plaintiff's behavior at the production meeting.  Evans also stated that she was hearing a lot of comments from "people talking to [her] on the street" about Plaintiff's use of the word during and after the production meeting. (Evans Dep. 138:18-21, Pl.'s Resp. Mot. Summ. J. Ex. W.)  Finally, Evans told Ali that she had concerns about her on-air chemistry with Burlington in light of his use of the epithet.

Two days later, station management met with Burlington and informed him that he would not be put back on the air, and that his contract would not be renewed when it expired.

**B.     Procedural History**

In a Memorandum and Order dated December 28, 2010, we denied Defendants' motion for summary judgment as to Plaintiff's wrongful termination claim, relying in part on the Third Circuit's decision in *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001).  (Dec. 28, 2010 Mem. 28, ECF No. 48.)  *Abramson* held that even if the decisionmaker in a wrongful termination case does not harbor discriminatory animus, the employer could still held liable "if those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Id.* at 286 (citations omitted).  Defendants immediately submitted a motion for reconsideration or stay, pointing out that this theory of employer liability—known colloquially as "cat's paw" liability—figured prominently in a case that was then pending before the Supreme Court.  We agreed that the decision in that case, *Staub*

*v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186 (2011), would likely affect the outcome of this litigation, and we stayed this case pending the Supreme Court's decision.

*Staub* was decided on March 1, 2011.  However, because the employees whose animus the plaintiff in *Staub* had sought to attribute to the employer were supervisory employees, the Court explicitly declined to address whether its holding would apply in cases where the employee exhibiting discriminatory animus was not a supervisor, but was merely a coworker. *See Staub*, 131 S. Ct. at 1194 n.4 ("We express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision.").  The Third Circuit also has not addressed this issue.  We therefore requested an additional round of briefing to address how *Staub* affected Defendants' motion for summary judgment.

In a Memorandum dated October 24, 2014, we determined that under the new framework discussed in *Staub*, Plaintiffs had adduced sufficient evidence to establish genuine issues of material fact that would require a trial.  (Oct. 24, 2014 Mem. 28-30, ECF No. 67.)  Since there was no controlling authority on the issue, we analyzed whether a coworker's discriminatory animus could be attributed to the employer under the framework of agency law, as the Supreme Court has counseled in Title VII cases.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 785 (1998) (noting the Court's "admonition [in Title VII cases] to find guidance in the common law of agency, as embodied in the Restatement").  We also relied on the Supreme Court's later statement that in certain circumstances under Title VII, an employee may be considered a supervisor because "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies."  *Vance v. Ball State Univ.*, __ U.S. __, 133 S. Ct. 2434, 2452 (2013).  Utilizing this framework, we

concluded that there was a triable issue of fact regarding whether Joyce Evans had been aided by the existence of the agency relationship—or, to use *Vance*'s phrasing, whether Defendants "had effectively delegated the power to take tangible employment actions" to her, *id.*—such that it would be appropriate to hold Defendants liable for her alleged discriminatory animus.  (Oct. 24, 2014 Mem. 28-29.)  Drawing on the First Circuit's decision in *Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265 (1st Cir. 2014), we also concluded that there was a genuine issue of material fact as to whether Defendants had been negligent in permitting its employees' discriminatory acts to cause Plaintiff's termination.  (*Id.* at 29.)

Defendants filed a motion to certify the Order denying summary judgment on December 10, 2014 (ECF No. 71), and Plaintiff responded.  (ECF No. 72.)  We heard argument on December 19, 2014.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal if "[1] such order involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and . . . [3] an immediate appeal from the order may materially advance the ultimate termination of the litigation."  *Id.*  The burden is on the party seeking certification to establish that "exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after the entry of final judgment."  *Hall v. Wyeth, Inc.*, No. 10-738, 2010 WL 4925258, at *1 (E.D. Pa. Dec. 2, 2010) (quoting *L.R. v. Manheim Twp. Sch. Dist.,* 540 F. Supp. 2d 603, 608 (E.D. Pa. 2008)).

A controlling question of law is one which, at a minimum, would be reversible error on final appeal if decided erroneously.  *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974).  In addition, a question of law is controlling for purposes of § 1292(b) if it is "serious to

the conduct of the litigation, either practically or legally." *Id.*  On a practical level, "saving of time of the district court and of expense to the litigants was deemed by the sponsors to be a highly relevant factor." *Id.*  The key consideration is whether the issue "truly implicates the policies favoring interlocutory appeal . . . includ[ing] the avoidance of harm to a party pendente lite from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense." *Id.* at 756.

## III.   DISCUSSION

Defendants argue that this case presents a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order will materially advance the ultimate termination of the litigation.  (Def.'s Mot. 3-7.)  After giving careful consideration to Defendants' arguments, we will deny their request for certification and schedule this matter for trial.

### 1.      Controlling Question of Law

Defendants contend that Plaintiff's cat's paw theory of liability is a controlling question of law.  We disagree.  Defendants ignore Plaintiff's alternative theory of liability, which is that Mike Renda terminated Plaintiff based on his belief that certain behaviors that were permissible for African American employees were impermissible for white employees.  This is a straightforward, traditional theory of liability for wrongful termination under Title VII, and it does not rely on the cat's paw theory of liability.  Therefore, even if the Third Circuit were to conclude on interlocutory appeal that the cat's paw theory did not apply to coworkers like Joyce Evans, we would still require a trial to determine whether Plaintiff can prevail on his traditional employment-discrimination theory.  Any error in our cat's paw analysis would not necessarily constitute reversible error.

Nor do we believe that the cat's paw issue is serious enough to the conduct of the litigation to justify further delaying trial in this matter.  Plaintiff notes that there is significant overlap in the evidence regarding his traditional theory and his cat's paw theory of liability. (Pl.'s Resp. 8.)  Plaintiff is advancing alternative theories for a Title VII violation—not two different claims that would require presentation of different or additional evidence to the jury. We conclude that, although the presence or absence of the cat's paw theory will have a marginal effect on how this case is tried, the effect will not be so dramatic as to justify the delay required by an interlocutory appeal, or to "depart[] from the basic policy against piecemeal litigation." *Hall*, 2010 WL 4925258, at *1.  This case therefore does not present a controlling question of law.

## 2.       Substantial Ground for Difference of Opinion

Notwithstanding the fact that our conclusion that there is no controlling question of law ends the matter, we will continue the analysis by noting that there is substantial ground for a difference of opinion on this issue.  There is no controlling authority regarding whether cat's paw liability is available to impute the discriminatory animus of a nonsupervisory coworker to the employer.  The Supreme Court has deliberately left the question open, and the lower courts have reached varying conclusions.  For example, in *Velázquez-Pérez*, the First Circuit determined that the employer could be found liable if it was negligent in permitting a coworker's discriminatory acts to cause the plaintiff's termination.[8]  753 F.3d at 273.  Conversely, some district courts have

---

[8] The First Circuit did not explicitly refer to the plaintiff's claim in *Velazquez-Perez* as a cat's paw claim, but it did apply the analysis from *Staub* with the added requirement that because the employee exhibiting discriminatory animus was not a supervisor under *Vance*, the employer could only be liable if it was negligent in permitting the employee's actions to cause the victim's termination.  *Velázquez-Pérez*, 753 F.3d at 274 ("[A]n employer can be held liable under Title VII if:  the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-

refused to permit a plaintiff to impute a nonsupervisory coworker's discriminatory animus to the employer. *See, e.g.*, *Gomez v. City of N.Y.*, No. 12-6409, 2014 WL 4058700 (S.D.N.Y. Aug. 14, 2014). The lack of controlling authority from the Supreme Court or Third Circuit, combined with the varying conclusions reached by federal courts in other circuits, demonstrates that there is substantial ground for a difference of opinion as to whether Defendants can be vicariously liable for the discriminatory acts of its nonsupervisory coworkers.

### 3. Materially Advance the Ultimate Termination of the Litigation

Finally, we do not agree with Defendants that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). In determining whether an interlocutory appeal would materially advance the termination of the litigation, courts consider "whether the need for trial would be eliminated [and] whether the trial would be simplified by the elimination of complex issues." *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 600 (E.D. Pa. 2008). As Plaintiff observes, this case will proceed to trial regardless of whether his cat's paw theory of liability is viable. (Pl.'s Resp. 8.) The only way that certifying the Order to the Third Circuit would materially advance the termination of this litigation is if the Court of Appeals determined that Defendants are entitled to summary judgment. However, "[t]hat is true anytime a district court denies a motion for summary judgment." *United Nat. Ins. Co. v. Aon Ltd.*, No. 04-539, 2008 WL 942577, at *3 (E.D. Pa. Apr. 7, 2008). It does not mean that every denial of summary judgment in which the precise contours of the law are unclear should be certified for interlocutory appeal.

Moreover, the complexity of the issues in this case counsels in favor of presenting the Court of Appeals with a complete record to consider, without the unresolved factual disputes

---

worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation.").

attendant in an interlocutory appeal. "[I]t seems far more sensible . . . to resolve the factual disputes first, and then, should an appeal from either side turn out to be desirable, present the case to the Court of Appeals." *Id.* at *4. Accordingly, "here, on the eve of trial, . . . what is most likely to advance the ultimate termination of this lawsuit is the scheduling of a trial. The parties may then either proceed to trial, or proceed to settle the lawsuit." *Id.* at *3.

**IV.    CONCLUSION**

This case has been pending for over five years. We will not further delay its resolution by permitting "piecemeal review and its attendant delays and waste of time." *Katz*, 496 F.2d at 764. For the foregoing reasons, Defendants' Motion to Certify will be denied.

An appropriate Order follows.

                              **BY THE COURT:**

                              _____
                              **R. BARCLAY SURRICK, J.**

9