IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS BURLINGTON            :
                             :          CIVIL ACTION
      v.                     :
                             :          NO. 09-1908
NEWS CORPORATION, ET AL.     :

**MEMORANDUM**

**SURRICK, J.**                                        **MAY <u>27</u>, 2015**

Presently before the Court are various Motions *in Limine* filed by Plaintiff (ECF Nos. 33, 34, 35, 84, 85, 86) and Motions *in Limine* filed by Defendants (ECF Nos. 37, 38, 39, 87, 88, 89). For the following reasons, Plaintiff's Motions will be granted in part, and denied in part, and Defendants' Motion will be granted in part, and denied in part.

## I.      BACKGROUND

This is an action for reverse race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, *et seq.*, 28 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951, *et seq.*  Plaintiff Thomas Burlington, a white male, alleges that he was terminated by Defendants for using the "nigger" in a non-pejorative manner in a discussion during a newsroom editorial meeting, while African American employees were not punished for using the same word in the workplace.  (Compl. ¶¶ 26-42, ECF No. 1.)

### A.      Factual Background

A more detailed factual background can be found in our October 24, 2014 Memorandum denying Defendants' Motion for Reconsideration of our summary judgment ruling.  *Burlington v. News Corp.*, 55 F. Supp. 3d 723 (E.D. Pa. 2014).  We provide an overview of the facts giving rise

to this action. Plaintiff, a weekend anchor with Fox 29 News (also referred to as "Fox" or the "Station"), was terminated after uttering a racial epithet during a production meeting in which a story about the NAACP's symbolic burial of the "n-word" was discussed. Plaintiff did not use the epithet pejoratively. Station General Manager Mike Renda, a white male, ordered Human Resources head Ameena Ali to conduct an investigation into the incident. Accordingly, Ali convened a meeting during which she, Renda, and another supervisor asked Plaintiff to give his side of the story. Plaintiff repeated the conversation from the production meeting, including the racial epithet he had used. This brought the meeting to an immediate end, and Plaintiff was suspended. An African American employee who was likewise asked to give an account of the conversation at the production meeting used the epithet several times in an e-mail he sent in response management's request. He was not disciplined.

Initially, it did not appear that Plaintiff would lose his job over the incident. He received a final warning and was referred to the Employee Assistance Program ("EAP") for sensitivity training. Renda informed Plaintiff that they were "going to ride this one out," and that Plaintiff would be reinstated if he complied with the EAP's requirements. (Pl.'s Dep. 224, Pl.'s Resp. Mot. Summ. J. Ex. A, ECF No. 28.)

Plaintiff has adduced evidence that after the incident in the production meeting, his co-anchor, Joyce Evans, an African American female, undertook a sustained behind-the-scenes campaign to get him fired. Evans encouraged fellow employees to complain to management about Plaintiff, even going so far as to ask a white coworker to complain to management because "[t]he only people who have complained so far have been black people." (Rogers Dep. 102-103, Pl.'s Resp. Mot. Summ. J. Ex. L, ECF No. 28.) Evans also confronted Plaintiff, telling him that

"[b]ecause you're white you can never understand what it's like to be called a nigger and . . . you cannot use the word 'nigger.'" (Pl.'s Dep. 188.) Eventually, news of Plaintiff's use of the racial epithet was leaked to the media, and several Philadelphia newspapers printed the story. Leaking such information is a terminable offense at Fox 29 News. However, Defendants never attempted to discover the source of the leak, which remains unknown.

Plaintiff complied with the EAP requirements and was declared "in compliance" and fit to return to work. Renda therefore wrote in an e-mail that "[w]e need to talk about [Burlington's] return scenario—news would like him to return Wed." (Pl.'s Resp. Mot. Summ. J. Ex. NN.) At this point, Evans contacted Ali to inform her that she was receiving phone calls from the National Association of Black Journalists ("NABJ") and the Philadelphia Association of Black Journalists ("PABJ") regarding Plaintiff's behavior at the production meeting. Evans also stated that she was hearing a lot of comments from "people talking to [her] on the street" about Plaintiff's use of the word during and after the production meeting. (Evans Dep. 138, Pl.'s Resp. Mot. Summ. J. Ex. W.) Finally, Evans told Ali that she had concerns about her on-air chemistry with Plaintiff in light of his use of the epithet.

Two days later, station management met with Plaintiff to inform him that he would not be put back on the air, and that his contract would not be renewed when it expired.

### B. Procedural History

Plaintiff filed a complaint against Defendants on May 4, 2009, alleging race discrimination and hostile work environment in violation of Title VII and the PHRA. Defendants filed a Motion for Summary Judgment on Plaintiff's discrimination and hostile work environment claims on August 31, 2010. (*See* Defs.' Mot. Summ. J., ECF No. 26.) We granted

Defendants' Motion with regard to Plaintiff's hostile work environment claim and denied the Motion with regard to Plaintiff's discrimination claim. *See Burlington v. News Corp.*, 759 F. Supp. 2d 580 (E.D. Pa. 2010). In denying the Motion for Summary Judgment on Plaintiff's discrimination claim, we relied in part on what has become known as the "cat's paw" theory of liability. Cat's paw liability applies when a member of a protected class is subjected to an adverse employment action by a decisionmaker who is himself free of discriminatory animus, but whose actions are influenced by other employees who are motivated by discriminatory animus. *Id*. at 599. Defendants immediately sought a stay pending the Supreme Court's Decision in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). (*See* Defs.' Mot. Reconsider, ECF No. 50.) Defendants pointed out that *Staub*, which involved cat's paw liability was presently before the Supreme Court. Defendants requested that we stay this matter until the Supreme Court issued its opinion in *Staub*. (*See id.* at 2-5.) We agreed and stayed the matter in anticipation of the Supreme Court's ruling. *See Burlington v. News Corp.*, No. 09-1908, 2011 U.S. Dist. LEXIS 1988, at *6-7 (E.D. Pa. Jan. 10, 2011).

*Staub* was decided on March 1, 2011. We requested an additional round of briefing to address how *Staub* affected Defendants' motion for summary judgment. In a Memorandum dated October 24, 2014, we determined that under the new framework discussed in *Staub*, Plaintiffs had adduced sufficient evidence to establish genuine issues of material fact that would require a trial. *Burlington*, 55 F. Supp. 3d at 741.[1]

---

[1] Because there was no controlling authority on the issue, we analyzed whether a coworker's discriminatory animus could be attributed to the employer under the framework of agency law, as the Supreme Court has counseled in Title VII cases. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 785 (1998) (noting the Court's "admonition [in Title VII cases] to find guidance in the common law of agency, as embodied in the Restatement"). We also relied in part on the Supreme Court's later statement that in certain circumstances under Title VII, an employee may be considered a supervisor because "the employer may be held to have effectively

4

On December 14, 2014, Defendants filed a motion to certify the Order denying summary judgment.  (ECF No. 71.)  The Court heard argument on December 19, 2014.  On January 12, 2015, we denied Defendants' Motion to Certify.  (ECF Nos. 74, 75.)  Trial is scheduled to begin on June 8, 2015, with jury selection to take place on June 4 and 5, 2015.  (ECF No. 78.)

## II.    DISCUSSION

Because the Motions *in Limine* each address discrete evidentiary issues, we will address them separately.

### A.    Defendants' Motion *in Limine* To Exclude References To Racial Bias of Non-Supervisory Co-Workers Or Reliance On The "Cat's Paw" Theory Of Liability (ECF No. 89)[2]

Defendants seek to preclude Plaintiff from:  (1) presenting or making any reference to any evidence of the alleged racial bias of co-workers of Plaintiff who are not Michael Renda, or third parties; (2) relying on the "cat's paw" theory to impute liability to Defendants based on the alleged racial animus and actions of such non-supervisory co-workers and third parties; and (3) presenting or making reference to any evidence that Defendants are responsible or can be held responsible for any media coverage of Plaintiff.  Defendants contend that evidence that non-supervisory co-workers, to whom Plaintiff uttered the racial epithet at issue in this case, harbored

---

delegated the power to take tangible employment actions to the employees on whose recommendations it relies."  *Vance v. Ball State Univ.*, __ U.S. __, 133 S. Ct. 2434, 2452 (2013).  Utilizing this framework, we concluded that there was a triable issue of fact regarding whether Joyce Evans had been aided by the existence of the agency relationship—or, to use *Vance's* phrasing, whether Defendants "had effectively delegated the power to take tangible employment actions" to her, *id.*—such that it would be appropriate to hold Defendants liable for her alleged discriminatory animus.  *Burlington*, 55 F. Supp. 3d at 741.  Drawing on the First Circuit's decision in *Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265 (1st Cir. 2014), we also concluded that there was a genuine issue of material fact as to whether Defendants had been negligent in permitting its employees' discriminatory acts to cause Plaintiff's termination.  *Burlington*, 55 F. Supp. 3d at 741.

[2]  Defendants filed the instant Motion *in Limine* on April 15, 2015.  Plaintiff filed a Response to the Motion on April 29, 2015.  (ECF No. 95.)

discriminatory racial animus, is improper and inadmissible. Defendants seek to constrict the issues at trial to evidence surrounding whether Michael Renda, the station manager and sole decision-maker, acted out of racial bias in deciding not to renew Plaintiff's contract. Defendants rely on the same argument that they made in previous motions: that the cat's paw theory of liability is not viable, and therefore any evidence that Plaintiff's non-supervisory co-workers or third parties, such as media outlets, harbored racial animus is irrelevant and highly prejudicial under Federal Rule of Evidence 403. In addition, Defendants claim that admitting this evidence would, in effect, create a series of mini-trials within the trial.

We have already considered—on two separate occasions—Defendants' argument about the viability of the cat's paw theory of liability. Each time, we rejected Defendants' argument, and held that the cat's paw theory of liability is viable. In our December 23, 2010 Summary Judgment Memorandum, we concluded that

> [T]here is a triable issue of fact as to whether "those exhibiting discriminatory animus influenced or participated in the decision to terminate" Plaintiff. Viewing the evidence in the light most favorable to Plaintiff, and making all inferences in his favor, there are genuine issues of material fact regarding whether Plaintiff's co-workers in general, and Joyce Evans in particular, exhibited discriminatory animus and influenced the decision to terminate Plaintiff.

*Burlington*, 759 F. Supp. 2d at 600 (quoting *Abramson v. William Paterson Coll.*, 260 F.3d 265 (3d Cir. 2001)).

In our October 24, 2015 Memorandum denying Defendants' motion to reconsider the summary judgment ruling, we concluded that under the new framework described *Staub*, there were genuine issues of fact on the cat's paw theory of liability, noting that Plaintiff had presented sufficient evidence showing:

> that one or more of his nonsupervisory coworkers: (1) performed an act motivated by discriminatory animus; (2) the act was intended by the coworker to

6

cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action; and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation; or (b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation.

*Burlington*, 55 F. Supp. 3d at 738-39.

In addition, we denied Defendants' request to certify the cat's paw issue for immediate appeal. *See Burlington v. News Corp*., No. 09-1908, 2015 U.S. Dist. LEXIS 3816, at *9-14 (E.D. Pa. Jan 12, 2015). Defendants acknowledge that the Court has already concluded that Plaintiff may rely on the cat's paw theory of liability during trial. (Defs.' Mot. at 2 n.2.) Defendants state that they merely file this Motion "to preserve the issue for appeal." (Id.) Defendants have done so. Their Motion *in Limine* to Exclude References to Racial Bias of Non-Supervisory Co-Workers or Reliance on the "Cat's Paw" Theory of Liability will be denied.

**B.      Defendants' Motion *in Limine* To Exclude References To The Use Of The Word "N-gg-r" By Non-Similarly Situated Employee John Jervay (ECF No. 88)[3]**

In this Motion, Defendants seek to preclude Plaintiff from presenting any evidence that John Jervay, an African American, used the word "nigger" and Defendants' decision not to discipline him for using the word as evidence of disparate treatment. On June 28, 2007, Jervay sent an e-mail to Leslie Tyler, the Assistant News Director, and Phil Metlin, the News director, complaining about Plaintiff's use of the word "nigger" during a June 23, 2007 editorial meeting, and in an apology to Jervay later that day. (Defs.' Mem. 1 & Exs. A, B, ECF No. 88.) Jervay sent the e-mail at the request of Tyler pursuant to an internal investigation into the incident. In his e-mail, Jervay described Plaintiff's actions, and how they made him "uncomfortable." (*Id*. at

---

[3] Defendants filed the instant Motion *in Limine* on April 15, 2015. Plaintiff's filed a Response to the Motion on April 29, 2015. (ECF No. 94.)

Ex. A.)  In the e-mail, Jervay explicitly used the word "nigger" three times, twice in all capital

letters.  (*Id.*)

In support of their request to exclude evidence of Jervay's use of the "n-word" in his e-

mail, Defendants contend that Jervay is not similarly situated to Plaintiff, and therefore cannot be

used as an appropriate comparator.  To provide the context of Defendants' argument, we

summarize briefly the law applicable to Plaintiff's employment discrimination claim.

Ordinarily, to establish a prima facie case of discrimination, a plaintiff must show that

"(1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she

was subject to an adverse employment action despite being qualified; and (4). . . circumstances

that raise an inference of discriminatory action . . . ."  *Sarullo v. United States Postal Serv.*, 352

F.3d 789, 797 (3d Cir. 2003).  With respect to claims for reverse discrimination, which this case

presents, the first element of the prima facie case is altered.  *See Iadimarco v. Runyon*, 190 F.3d

151, 161 (3d Cir. 1998) (recognizing that a non-minority need not show membership in a

protected class and instead must "present evidence to allow a fact finder to conclude that the

employer is treating some people less favorably than others based upon a trait that is protected

under Title VII.").   Thus, in reverse discrimination cases, "a non-minority plaintiff must show

[that] (1) he or she was qualified for the position in question, (2) he or she suffered an adverse

employment action, and (3) the evidence is adequate to create an inference that the adverse

employment action was based on a trait protected by Title VII."  *Warenecki v. City of Phila.*, No.

10-1450, 2010 U.S. Dist. LEXIS 116912, at *13-14 (E.D. Pa. Nov. 3, 2010) (citing *Mosca v.

Cole*, 384 F. Supp. 2d 757, 765 (D.N.J. 2005)).

In order to satisfy this third element, a plaintiff may present evidence that similarly situated coworkers were treated more favorably than the plaintiff. S*ee Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011). However, this is not the only way to establish an inference of discrimination. Proof that the employer treats similarly situated employees outside of the protected class more favorably is recognized as merely "an alternative" to the prong requiring an inference of discrimination. *Grassmyer v. Shred-It USA, Inc*., 392 F. App'x 18, 27 (3d Cir. 2010). "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo*, 352 F.3d at 798 (internal quotation marks omitted). To be similarly situated, the comparator employee "must be similarly situated in all relevant respects . . . [a] determination . . . [which] takes into consideration factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher*, 441 F. App'x at 882. Determining whether an individual is similarly situated "requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." *Monaco v. Am. Gen. Assur. Co*., 359 F.3d 296, 305 (3d Cir. 2004).

Defendants argue that Jervay's e-mail is inadmissible because Jervay is not a proper comparator for purposes of establishing a prima facie case of discrimination. Specifically, they contend that the circumstances giving rise to Plaintiff's use of the word "nigger" is "overwhelmingly dissimilar" to the circumstances giving rise to Jervay's use of the word. Defendants point to the fact that Plaintiff used the word multiple times in multiple settings,

whereas Jervay's use of the word was in a private e-mail that he wrote at the request of the station to simply report the incident.

We previously considered Defendants' argument that Jervay is not a proper comparator. In our December 23, 2010 Summary Judgment Memorandum, we referenced deposition testimony of Michael Renda, the station manager and proclaimed decision-maker. Renda testified that he did not know why Jervay's use of the word was not a violation of Fox's policy and Plaintiff's use of the word was. In considering this testimony, we concluded that:

> A reasonable jury could conclude that Renda's testimony demonstrates that Defendants were unable to draw a principled, non-race-based distinction between Jervay's use of the word in describing what happened at the newsroom editorial meeting and Plaintiff's use of the word when he was asked to describe what had happened at the meeting. Plaintiff's use of the word elicited a severely negative reaction, brought the meeting to a close before he could explain himself, and was followed by his immediate suspension, while Jervay's use of the word elicited only Defendants' defense of his actions. Plaintiff is white. Jervay is African American. Management's inability to explain why Jervay was allowed to use the word while Plaintiff was not permits the inference that their races influenced the decision, and that a similarly situated African American employee was treated more favorably than Plaintiff under similar circumstances.

*Burlington*, 759 F. Supp. 2d at 595.

The case relied on by Defendants, *Thomas v. City of Phila.*, 573 F. App'x 193 (3d Cir. 2014), does not change our conclusion.[4] In *Thomas*, the Third Circuit determined that an employee was not similarly situated because "he was only alleged to have been in an inappropriate location once at the end of a work day, in contrast to [the plaintiff] who was alleged to have been away from his workplace three times, in the middle of the work day." *Id*. at 196. Defendants contend that similar to the facts in *Thomas*, Plaintiff used the word multiple times in different contexts, whereas Jervay used it only three times in one e-mail. The conclusion reached in *Thomas* was based on a different set of facts, and is inapposite. In

---

[4] *Thomas* was decided after our Summary Judgment Memorandum was entered.

*Thomas*, there is no indication of the number of times an employee must be found in an inappropriate location to qualify for disciplinary action.  It is plausible that the plaintiff in *Thomas* was disciplined because being away from the workplace multiple times constitutes a violation of the employer's policy, whereas being away only once does not.  Here, Renda, the station manager and decision-maker, testified that any time the "n-word" is used, it is a violation of Fox's policy.  *Burlington*, 759 F. Supp. 3d at 595.  Therefore, a quantitative comparison of the frequency that the word was uttered does not apply when determining whether Jervay was similarly situated.

Defendants also argue that Plaintiff's use of Jervay's e-mail as proof of disparate treatment would be unfair because the e-mail was sent pursuant to an investigation under Title VII, and therefore, Defendants were, by law, prohibited from disciplining Jervay.  Defendants' argument focuses on the anti-retaliation provision in Title VII, which prohibits retaliation because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VI]."  42 U.S.C. § 2000e-3(a); *see also Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009).  Defendants argue that Jervay used the "n-word" in the context of an investigation under Title VII and was therefore protected activity.  Defendants contend that "permitting Plaintiff to argue that Defendants' failure to discipline Jervay is evidence of discrimination would be clear error and would turn the anti-retaliation provision on its head and place employers in an impossible 'catch-22.'"  (Defs.' Mot. 3.)  We disagree.  Defendants' concern about compliance with the anti-retaliation clause is disingenuous in light of their discipline of Plaintiff for his use of the

"n-word" during the investigation into the June 23, 2007 incident.  In our October 24, 2014

Memorandum, we described Defendant's reaction:

> Renda ordered Ameena Ali to conduct an investigation into Plaintiff's actions. As part of that investigation, Ali asked Plaintiff to participate in a meeting with her, Metlin, and Renda on June 29, 2007.  During the meeting, Metlin asked Plaintiff to give his version of the events at the editorial meeting the previous Saturday. Plaintiff recited what he had said in the editorial meeting, using the word in the process. Ali responded, "Tom, you're still saying the word, why are you doing that?" Plaintiff replied that he was simply relating what had happened at the editorial meeting, as Metlin had requested.

*Burlington*, 55 F. Supp. 3d at 728-29.  Both Jervay and Plaintiff used the full word during

the course of the investigation.  Yet, Plaintiffs' use of the word was met with a harsh

reaction, and ultimately, discipline, whereas Jervay's use of the word was not.  In

addition, Defendants have not provided any authority, and we are aware of none, that

would support a finding that an employee's explicit violation of company policy—here,

use of the word "nigger" at the workplace—is considered "protected activity" if that

violation occurred while assisting in an investigation pursuant to Title VII.

Accordingly, Defendant's Motion to exclude evidence of John Jervay's use of the

word "nigger" will be denied.

### C.     Defendants' Motion *in Limine* to Exclude Any Reference To The Alleged Use Of The Word "N-gg-r" By Non-Similarly Situated Employee Joyce Evans (ECF No. 87)[5]

Defendants also seek to exclude any evidence regarding (1) the alleged use of the "n-

word" by Joyce Evans, and (2) Defendants' failure to discipline Evans for her use of the word as

evidence of disparate treatment.  The evidence centers on a discussion that occurred between

Plaintiff and Evans shortly after Plaintiff used the word during the June 23, 2007 editorial

---

[5] Defendants filed the instant Motion *in Limine* on April 15, 2015.  Plaintiff's filed a Response to the Motion on April 29, 2015.  (ECF No. 93.)

meeting. Plaintiff testified that during that conversation, Evans told him that because he was white, he could never understand what it is like to be called "nigger" and that because he is white, he cannot use that word. *Burlington*, 55 F. Supp. 3d at 739. Plaintiff further alleges that during this conversation, Evans used the word twice. Evans denies telling Plaintiff that he could not say the word because he was white, and also denies ever using the full word during their conversation. *Id*.

In support of their request to exclude evidence of Plaintiff's conversation with Evans, Defendants contend that Evans is not a similarly situated employee. This is true. We have already determined that Evans is not similarly situated in light of the fact that Plaintiff did not report Evans's alleged use of the "n-word" to management until after he filed his EEOC charge, and after he was terminated. *Burlington*, 759 F. Supp. 2d at 595 n.4. However, Plaintiff is not arguing that evidence of Plaintiff's conversation with Evans is admissible because Evans is similarly situated. Rather, Plaintiff contends that the conversation, including Evans' use of the word, is evidence of Evans' discriminatory animus.

In our October 24, 2014 Memorandum, we concluded that Plaintiff presented evidence sufficient to establish a genuine issue of fact on a cat's paw theory of liability. As part of this analysis, we concluded that Plaintiff adduced evidence to show that one or more of his nonsupervisory coworkers "performed an act motivated by discriminatory animus." *Burlington*, 55 F. Supp. 3d at 739.[6] In reaching this conclusion, we stated that

---

[6] We determined in our October 24, 2014 Memorandum that under the framework guided by *Staub* and agency law, the elements necessary to prove a claim under a cat's paw theory of liability include that one or more of nonsupervisory coworkers " (1) performed an act motivated by discriminatory animus; (2) the act was intended by the coworker to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action; and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation; or

The evidence shows that Joyce Evans acted with discriminatory animus in the wake of the editorial meeting at which Plaintiff used the word. Her actions were based on her belief that there are certain words that African Americans can use in the workplace, but not whites—a belief that appears to have been shared by Plaintiff's coworkers, and even management. In our summary-judgment opinion, we rejected the idea that because modern social norms permit African Americans to use the word but not whites, an adverse employment action that is grounded in this belief is not actionable under Title VII.

*Burlington*, 55 F. Supp. 3d at 739. The evidence presents a factual question as to whether Evans was the driving force behind Plaintiff's termination. Evidence of Evans's discriminatory animus is therefore highly relevant to Plaintiff's discrimination claim under the cat's paw theory of liability. *Id.*

In addition, we are satisfied that the conversation between Evans and Plaintiff, including Plaintiff's recounting of things said by Evans, is relevant because it constitutes circumstantial evidence of the discriminatory atmosphere at which the incident giving rise to this action arose. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) ("Although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out, and therefore can be relevant to the question of retaliation."); *see also Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 546 (3d Cir. 1992) (observing that evidence of discriminatory atmosphere may be relevant because it tends "to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff"). The district court retains discretion to admit or exclude stray remarks by nondecisionmakers under the general principles of relevancy. *Walden*, 126 F.3d at 521 (citing Fed. R. Evid. 401). Here, Evans's use of the word "nigger" in the context of

---

(b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relationship." *Burlington*, 55 F. Supp. 3d 738-39 (internal citations omitted).

admonishing Plaintiff for his use of the same word, together with other evidence that Evans influenced the decisionmakers to take actions against Plaintiff, is relevant circumstantial evidence of race discrimination.  A reasonably jury could conclude that Defendants maintained an atmosphere that permitted treatment of employees differently on the basis of race.

Accordingly, Defendants' motion to exclude evidence of Plaintiff's conversation with Evans is denied.  However, Plaintiff may not argue that Evans' use of the word, and Defendants' lack of discipline of Evans, is evidence of disparate treatment.  Because Plaintiff did not complain about Evans's use of the word, Evans is not similarly situated.  With regard to Defendants' argument that Evans' denied using the full word, Defendants are certainly permitted to offer testimony to that effect.  It is up to the jury to weigh the credibility of the witnesses.

**D.      Plaintiff's Motion *in Limine* to Exclude February 9, 2009 EEOC Determination (ECF Nos. 33, 85)[7]**

In this Motion, Plaintiff seeks to exclude from trial evidence of the Equal Employment Opportunity Commission's (EEOC) determination of his claim.  On or about November 17, 2007, Plaintiff filed a charge with the EEOC, complaining of acts of discrimination and retaliation by Defendants.  On February 5, 2009, the EEOC issued a Dismissal and Notice of Rights ("EEOC Determination").  The EEOC Determination provides, in relevant part:

> THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:
>
> [X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes

---

[7] Plaintiff originally filed the instant Motion *in Limine* on November 30, 2010.  (ECF No. 33.)  Defendants filed a Response to the Motion on December 14, 2010.  (ECF No. 45.)  Each party filed a Reply on December 23, 2010.  (ECF Nos. 46, 47.)  The matter was stayed pending the Supreme Court's decision in *Straub*, and pending outcome of a related litigation, which has since completed.  Plaintiff filed a supplemental Motion *in Limine* on April 15, 2015 (ECF No. 85), to which Defendants filed a Response on April 29, 2015 (ECF No. 99).

violations of the statutes.   This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

(ECF No. 33 at Ex. B.)   Plaintiff argues that the EEOC determination is not relevant to his claims, citing Rule 401 of the Federal Rules of Evidence.  Plaintiff also argues that even if the EEOC Determination has some relevance, it is unfairly prejudicial, would confuse the jury, and therefore should be excluded under Rule 403 of the Federal Rules of Evidence.

Relevant evidence is anything having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  *See* Fed. R. Evid. 401.  We will assume for purposes of this Motion that the EEOC Determination is relevant.  *See El v. SEPTA*, 479 F.3d 232, 248 n.19 (3d Cir. 2007) ("EEOC determinations are relevant substantive evidence in Title VII cases.").  However, "[l]ike all relevant evidence, [it is] excludable under Federal Rule of Evidence 403 if substantially more prejudicial than probative."  *Id.*  (citing *Coleman v. Home Depot, Inc*., 306 F.3d 1333, 1344-45 (3d Cir. 2002)).

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The Third Circuit has stated that "[t]he weight of the case law holds that Rule 403 may operate on an EEOC report, and that the decision of whether or not an EEOC Letter of Determination is more probative than prejudicial is within the discretion of the trial court, and to be determined on a case-by-case basis."  *Coleman*, 306 F.3d at 1345.  The

assessment of probative value versus prejudicial effect under Rule 403 "should take into consideration the proof value of the particular report as and when offered at trial." *Id.*

Here, there is very little probative value in the EEOC determination. It represents mere conclusory statements, such as "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (ECF No. 33 at Ex. B.) It contains no factual basis for arriving at this conclusion, and appears to be nothing more than an EEOC form with boilerplate language. *See Coleman*, 306 F.3d at 1345 (observing the low proof value of an EEOC determination where it "was more conclusory than factual in nature"); *Haas v. Wild Acres Lakes Prop. & Homeowners Ass'n*, No. 13-898, 2014 U.S. Dist. LEXIS 32690, at *13-14 (M.D. Pa. Mar. 13, 2014) (excluding EEOC determination where the nature of the determination was conclusory). *Cf. Hodge v. Superior Court of the V.I.*, No. 07-87, 2009 U.S. Dist. LEXIS 95853, at *7 (D.V.I. Oct. 14, 2009) (Sanchez, J.) (observing that the EEOC Determination "is no evidence at all," where it does not detail factual findings, and only contains conclusory statements purport to be a determination of the merits without any reference to specific evidence). Moreover, the EEOC Determination appears to be nothing more than a non-decision. It simply advises that it is "unable to conclude" whether a violation occurred and "does not certify that the respondent is in compliance." (ECF No. 33 at Ex. B.) This indecisive language has no probative value. *See Berry v. Georgetown Inn, Ltd.*, No. 08-205, 2010 U.S. Dist. LEXIS 14392, at *3-4 (W.D. Pa. Feb. 18, 2010) (excluding EEOC determination and noting that it represents a "non-decision" and is irrelevant).

In addition, the prejudicial effect of the EEOC Determination is high. The fact that it "originated from an authoritative government agency" has the potential to "confuse and mislead

the jury." *See Martinelli v. Penn Millers Ins. Co*., 269 F. App'x 226, 229 (3d Cir. 2008) (affirming district court's exclusion of EEOC determination after considering the prejudicial effect caused by juror confusion); *Berry*, 2010 U.S. Dist. LEXIS 14392, at *4 ("A jury could easily confuse the meaning of the document as suggestive of the jury's ultimate legal question."). Permitting Defendants to admit the EEOC Determination also risks prejudice because it requires the needless presentation of cumulative evidence. *Id*.; *Haas*, 2014 U.S. Dist. LEXIS 32690, at *14. The jurors will be more than capable of weighing the evidence and testimony presented, and arriving at a conclusion as to the merits of Plaintiff's claims. The EEOC Determination does not assist them in this endeavor. Plaintiff's Motion to exclude the EEOC Determination will be granted.

**E.**    **Defendants' Motion *in Limine* To Preclude Testimony Regarding Plaintiff's Claim For Damages (ECF No. 39)[8]**

In this Motion, Defendants' seek to preclude Plaintiff from offering testimony regarding his claim for damages at trial. Defendants argue that during his deposition, Plaintiff asserted the attorney-client privilege in refusing to answer certain questions about his claimed damages. The deposition testimony at issue is as follows:

Q.    What is your demand sitting here today? What amount of money is it that you're requesting?

MS. MATTIACCI: Objection
    . . .

Q.    What is it that you want? That question you do have to –

MS. MATTIACCI: Are you asking for settlement discussions?

---

[8] Defendants filed the instant Motion *in Limine* on November 30, 2010. Plaintiff filed a Response to the Motion on December 14, 2010. (ECF No. 42.) After the stay was lifted, and matter was scheduled for trial, the parties did not file supplemental briefing.

MR. JOHNSON:  I'm asking what he's demanding.  It's his complaint.  He has to demand an amount.

    . . .

Q.  It's not for your attorneys to decide.  It's for you to decide.  What is it that you want?

MS. MATTIACCI:  Objection.  Do not answer the question.

    . . .

MR. JOHNSON:  On what basis are you instructing him not to answer?  State it for the record succinctly.

MS. MATTIACCI:  Attorney/client privilege.  He is not answering the question.

    . . .

Mr. JOHNSON:  I'm asking him what does he want; what amount of money is he seeking.  He's perfectly capable of answering the question.  It's his complaint.  He's the plaintiff.  He can answer that question.

MS. MATTIACCI:  Objection.  I'm telling you not to answer the question.

Mr. JOHNSON:  Are you following your attorney's advice?  Are you going to decline to answer that question?

A. [by Plaintiff]  Yes.

(Defs.' Mot. 4 & Ex. A.)

Defendants contend that because Plaintiff asserted the attorney-client privilege during his deposition, he is now precluded from providing evidence in support of his claimed damages. They argue that Plaintiff's refusal to answer these questions prevented them from conducting appropriate discovery into Plaintiff's claimed damages, contending that "[t]he attorney-client privilege cannot be used as both a shield and a sword."  (Defs.' Mt. 5 (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006)).)

Defendants' argument is specious and is unsupported by the facts and the law. Initially we note that the questions by Defendants' counsel were inappropriate and border on being hostile. The response from Plaintiff's counsel is not surprising. Plaintiff's assertion of the attorney-client privilege does not in any way preclude any evidence of damages at trial. Defendants have provided no authority to support the notion that a plaintiff should be foreclosed from offering evidence to prove his damages simply because he refused to respond to defense counsel's badgering, and provide information that may have disclosed confidential communications he had with his attorneys.

Contrary to defense counsel's assertion during the deposition, Plaintiff is not required to state the precise amount of damages in his Complaint. *See Sheet Metal Workers Local 19 v. Keystone Heating & Air Cond.*, 934 F.2d 35, 40 (3d Cir. 1991) ("Rule 8(a)(3) of the Federal Rules of Civil Procedure does not require that the demand for judgment be pled with great specificity."). In his Complaint, Plaintiff articulated five categories of damages that he seeks. There has been no argument before this Motion that Plaintiff's prayer for relief was insufficiently pled. Defendants can hardly claim that they have been foreclosed from conducting adequate discovery of Plaintiff's claimed damages. Plaintiff has provided Defendants with two reports from their expert in economic damages, Andrew Verzilli: one dated April 7, 2010, and another dated March 15, 2015. In addition, Mr. Verzilli has been deposed twice regarding the conclusions he reached in those reports.[9] Defendants' Motion to preclude Plaintiff from offering evidence of his claimed damages at trial will be denied.

---

[9] In a separate motion, Defendants seek to preclude Plaintiff from making any reference to, or offering the reports by, or testimony of, Plaintiff's expert, Andrew Verzilli. (ECF No. 109) We will address this motion in a separate memorandum.

**F.       Defendants' Motion *in Limine* To Preclude Testimony Of Steve Dickstein, Steve Sheinen And Bethann Jacobski (ECF No. 38)[10]**

In this Motion, Defendants seek to preclude Plaintiff from offering the testimony of three witnesses:  his agents and attorneys, Steve Dickstein and Steve Sheinen; and his wife, Bethann Jacobski.  During Plaintiff's deposition, defense counsel asked Plaintiff about things he discussed with his wife and his attorneys regarding the June 23, 2007 editorial meeting.  Plaintiff was specifically asked what he told his wife about the incident.  Plaintiff's counsel objected to the question and cited the marital privilege.  (Defs.' Mot. 4 & Ex. A.)  Also during the deposition, Plaintiff testified that after he learned he was suspended with pay, he contacted his agents, Dickstein and Sheinen, to let them know what happened and ask for their advice.  Defense counsel asked what his agents said in response.  Plaintiff's counsel objected to the question, citing the attorney-client privilege.  (*Id*. at 4-5 and Ex. A.)  Dickstein and Sheinen served in a dual capacity, both as Plaintiff's legal counsel and his business agents.

Defendants argue that by refusing "to allow Defendants to conduct discovery concerning Plaintiff's communications with his wife and agents concerning the central allegations in this case," Plaintiff should be precluded from presenting testimony from these three individuals.  (Defs.' Mot. 5.)  According to Defendants, Plaintiff is not permitted to use the attorney-client privilege and marital privilege as both a "sword and a shield."  (Defs.' Mot. 5.)

Plaintiff responds that it was within his right to refuse to answer questions that would reveal confidential attorney-client and husband-wife privileges.  We agree.  Plaintiff testified that when he contacted Dickstein and Sheehan, he was looking for legal advice.  (Pl.'s Resp. 5 & Ex.

---

[10] Defendants filed the instant Motion *in Limine* on November 30, 2010.  Plaintiff filed a Response to the Motion on December 14, 2010.  (ECF No. 41.)  After the stay was lifted, and matter was scheduled for trial, the parties did not file supplemental briefing.

B., ECF No. 41.)  Plaintiff was not required to disclose the contents of his conversations with

Dickstein and Sheinen.  *See In re Teleglobe Communs. Corp.*, 493 F.3d 345, 359 (3d Cir. 2007)

("The attorney-client privilege protects communications between attorneys and clients from

compelled disclosure.").  Similarly, Plaintiff was in his right to refuse to answer questions about

confidential communications he made to his wife, even if those communications were relevant to

the issues in this lawsuit.  *See Dommel Props., LLC v. Jonestown Bank & Trust Co*., No. 11-

2316, 2013 U.S. Dist. LEXIS 129295, at *10-11 (M.D. Pa. Sept. 11, 2013) ("The confidential

communications privilege provides that 'in a civil matter neither husband nor wife shall be

competent or permitted to testify to confidential communications made by one to the other,

unless this privilege is waived upon the trial.'"  (quoting 42 Pa. Cons. Stat. § 5923)).

Simply because Plaintiff invoked the privileges does not mean that any testimony offered

by these witnesses should not be permitted.  Plaintiff states that these witnesses may testify about

other non-privileged information, including their observations about Plaintiff's emotional

distress after his termination and his efforts to secure new employment.  This is proper trial

evidence.  *See In re Equip. Leassors of Pa., Inc*., No. 02-2985, 2002 U.S. Dist. LEXIS 23994, at

*12 (E.D. Pa. Dec. 12, 2002) (noting that "the personal observations of an attorney which are not

derived directly through communications with his client do not fall under the auspices of the

attorney-client privilege"); *Fallowfield Dev. Corp. v. Strunk*, No. 89-8644, 1990 U.S. Dist.

LEXIS 4805, at *16 (E.D. Pa. Apr. 25, 1990) (noting that the marital communication privilege

applies only to confidential marital communications and not to observations made by the

defendant's wife); *see also Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("[T]he

protection of the [attorney-client] privilege extends only to communications and not to facts. A

fact is one thing and a communication concerning the fact is an entirely different thing.").

Defendants' complaint that they have been prevented from conducting appropriate discovery

regarding these witnesses is disingenuous. Plaintiff identified Dickstein, Sheinen, and Jacobski

in his Rule 26 disclosures in June 2010, and provided a summary of the information they were

believed to have knowledge of. Defendants had every opportunity to depose these witnesses but

chose not to do so.

In their supplemental memorandum, Defendants cite to an order issued by the Court of

Common Pleas in Chester County in relation to Plaintiff's lawsuit against the Daily News. *See*

*Burlington v. Phila Media Holdings, LLC t/a The Daily News*, No. 2008-05519-CA (Pa. Ct.

Com. Pl. Mar. 19, 2012). In that case, the court denied the defendants' motion to compel

Dickstein and Sheinen to provide information regarding their communications with Plaintiff.

This conclusion was based on the attorney-client privilege. (Defs.' Not. Supp. Auth. 6.)

Defendants seem to suggest that because the court in the Chester County case denied a motion to

compel, we should forbid any testimony that could be offered by these witnesses in this case. We

reject this suggestion. Again, these witnesses are permitted to testify about relevant, non-

privileged communications and observations about Plaintiff.

We also reject Defendants' argument that these witnesses should not be permitted to

testify because of the "tactics" Plaintiff used in the Chester County lawsuit. By tactics,

Defendants allege that witnesses—presumably Dickstein and Sheinen—"selectively invoke[ed]

the privilege, providing testimony that was helpful to Plaintiff but hid[] behind privilege when

unfavorable facts were solicited." (Defs.' Not. Supp. Auth. 6-7.) What occurred at the

depositions of these witnesses in the Chester County lawsuit has no bearing on whether they are

able to provide relevant, non-privileged testimony in this case. Defendants could have separately deposed these witnesses in relation to this case, but chose not to do so.

Defendants' request to preclude testimony from Steve Dickstein, Steve Sheinen, Bethann Jacobski, is denied.

G.    **Defendants' Motion *in Limine* To Exclude Any References To Richard Noonan's Lawsuit and David Huddleston's Use of the "N-Word" (ECF No. 37)[11]**

In this Motion, Defendants seek to exclude evidence that relates to (1) the alleged use of the word "nigger" by David Huddleston; and (2) a lawsuit filed in 20013 by Richard Noonan against Fox Television Stations of Philadelphia, Inc., which involved claims of race discrimination. We address these requests to exclude separately.

*1.    References to David Huddleston's Use of the "N-Word"*

Plaintiff alleges that Huddleston, an African American anchor who was employed by Defendants, referred to a criminal defendant during a discussion at an editorial meeting as a "dumb nigger." According to Plaintiff, his coworkers laughed at Huddleston's remark, and management was not informed of his use of a racial epithet in the workplace. By contrast, Plaintiff alleges that when he used the word in a non-pejorative sense during an editorial meeting, his coworkers were offended and complained to management, leading to Plaintiff's eventual termination. (Pl.'s Resp. 17, ECF No. 40.) Defendants contend that evidence of Huddleston's comment is inadmissible because Huddleston is not a similarly situated employee,

---

[11] Defendants filed the instant Motion *in Limine* on November 30, 2010. Plaintiff filed a Response to the Motion on December 14, 2010. (ECF No. 37.) After the stay was lifted, and matter was scheduled for trial, Defendants filed a Notice of Supplemental Authority in support of the Motion on April 14, 2015. (ECF No. 90.) Plaintiff filed a Response to Defendants' Notice of Supplemental Authority on April 29, 2015. (ECF No. 96.)

rending the evidence irrelevant. In addition, Defendants contend that even if it has some probative value, the evidence is highly prejudicial and should be excluded under Rule 403.

Defendants contend that Huddleston's use of the word during an editorial meeting is irrelevant for three reasons: (1) they were made during the tenure of a different decisionmaker; (2) nobody complained to management about Huddleston's comments; and (3) the comments did not result in negative publicity for the Station or Huddleston. We rejected these arguments in our Memorandum granting in part and denying in part Defendants' Motion for Summary Judgment, *see Burlington*, 759 F. Supp. 2d at 593-94, and we reject them now. We found in our Memorandum that the similarities between Huddleston's actions and Plaintiff's actions rendered irrelevant the fact that a different General Manager was in place when Huddleston made his comment. *Id.* We also concluded that Defendants' contention that Huddleston's comments were not reported to management, did not upset his coworkers, and did not result in negative publicity missed the point. The crux of Plaintiff's argument is that his comments upset his coworkers and led them to leak the story to the media and complain to management because they were operating on the impermissible race-based double standard that it is acceptable for African Americans to say the word, but not whites. Defendants' argument requires that we ignore the possibility that the different reactions Huddleston's and Plaintiff's comments received from coworkers are evidence of discrimination rather than a distinction that renders them too dissimilar to be relevant under Rule 401. We conclude that Huddleston's comments are relevant under Rule 401.

Huddleston's comments were arguably more offensive than Plaintiff's, and yet his coworkers simply laughed and did not report them to management. Plaintiff's comments, by contrast, resulted in an uproar among some of his colleagues that contributed to his suspension

and eventual termination.  A jury should be allowed to assess whether Plaintiff's race accounts for the difference.

After considering the arguments under Rule 403, we also conclude that the probative value of this evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Defendants argue that permitting the jury to hear evidence regarding Huddleston's use of the word during an editorial meeting would be unfairly prejudicial and would require them to call numerous additional witnesses, resulting in a "mini-trial" on the issue.  (Defs.' Mot. 7.)  Huddleston's comments, and the non-reaction to them by his coworkers, is probative evidence that the workplace environment at the Station permitted African Americans to use the word, but not whites.  We do not agree that allowing Plaintiff to present this evidence would be so unfairly prejudicial or would result in such undue delay that it substantially outweighs the probative value of the evidence.  Defendants' Motion to exclude evidence of Huddleston's comments is denied.

2.      *References to Richard Noonan's Lawsuit*

Defendants also seek to preclude evidence at trial regarding an action for discrimination brought by a white former anchor against the Station.  *See* Complaint, *Noonan v. Fox Television Stations of Phila., Inc.*, No. 03-5044 (E.D. Pa. Oct. 3, 2003), ECF No. 2.  During Joyce Evans's deposition in the *Noonan* action, she testified that she had told the General Manager and two News Directors that Fox "had a [news] team that was very white," and that the African American community was expressing concern that a Fox billboard with four white anchors was located in predominantly African American and Latino neighborhoods.  (Evans June 24, 2004 Dep. (*Noonan*) 56, 58-59, Pl.'s Resp. to Mot. S.J. Ex. TT, ECF No. 28.)  When asked who was

expressing concern about the racial composition of Fox's news team, Evans testified that she had heard this from "people on the street" (*id.* at 57) and "people leaving a voice mail." (*Id.* at 64.) In the instant action, Evans testified that she had heard comments about Plaintiff's use of the racial epithet from "people talking to [her] on the street" (Evans Dep. (Burlington) 138, Pl.'s Resp. to Mot. S.J. Ex. W, ECF No. 28), and that she had received a voicemail from the National Association of Black Journalists ("NABJ") and a voicemail from the Philadelphia Association of Black Journalists ("PABJ") about Plaintiff's behavior. (*Id.* at 137-138.) Defendants move to preclude Plaintiff from offering evidence regarding the *Noonan* action. (Defs.' Mot. 1-2, ECF No. 37; Defs.' Not. of Supp. Auth, ECF No. 90.)

Defendants argue that the *Noonan* action has nothing to do with Plaintiff's action against Fox 29 News and is therefore not relevant. (Defs.' Mot. 8-9.) Specifically, Defendants contend that the *Noonan* action took place five years before Plaintiff filed his lawsuit and involves different people and a different management team. (*Id.*) We disagree that the *Noonan* action has no relevance.

Plaintiff has adduced evidence that Joyce Evans influenced the Station's decision to terminate Plaintiff. *See Burlington*, 759 F. Supp. 2d at 600. Therefore, whether Joyce Evans harbors discriminatory animus toward whites is an important issue at trial. In *Noonan*, Evans testified that she had informed management that the Station's news team was "very white," and that the African American community would not tolerate a white anchor being hired to replace an outgoing white anchor. (Evans Dep. (Noonan) 56, 58-59.) Evans attributed these views to "people on the street" (*id.* at 57) and "people leaving a voice mail." (*Id.* at 64.) Soon thereafter, the Station chose not to renew Noonan's contract. In the instant case, Evans told Ameena Ali that "people [were] talking to [her] on the street" about Plaintiff's comments and that the NABJ

and PABJ had left voice mails regarding Plaintiff. (Evans Dep. (Burlington) 137-138.) Two days later, management informed Plaintiff that his contract would not be renewed. The similarity between Evans's actions in the two lawsuits, including her almost identical choice of words, is clear. Moreover, a jury could construe the *Noonan* action as evidence of a workplace in which racial politics are an effective tool for achieving one's ends. This evidence is relevant to the instant case under Rule 401.

Defendants also argue that even if evidence of the *Noonan* action is relevant, its probative value is outweighed by the prejudicial effect of having the jury learn that another white anchor filed a discrimination lawsuit against the Station. (Defs.' Mot. 9-10.) Defendants also contend that permitting Plaintiff to introduce evidence of the *Noonan* action at trial would result in the parties essentially having to try the *Noonan* case in front of this Court. (*Id.*) Plaintiff argues that the Third Circuit has disapproved of blanket restrictions on the type of evidence that can be presented in employment discrimination trials. (Pl.'s Resp. 14-15.)

We agree with Defendants that it would be highly prejudicial and would risk undue delay to replay the entire *Noonan* action in front of a jury as part of the proof in this case. However, when we conduct the balancing required by Rule 403, we conclude that the probative value of Joyce Evans's deposition testimony in *Noonan* outweighs any potential delay or prejudice. One of the key questions a jury will have to address is whether Joyce Evans was motivated by discriminatory animus when she took actions that appear calculated to result in Plaintiff's termination. That Evans engaged in similar behavior in *Noonan*, and even used the same phrases to describe her role, is highly probative evidence that, despite being seven years old, resembles the instant case closely enough to justify its admission. *See Cange v. Phila. Parking Auth.*, 08-3480, 2010 U.S. Dist. LEXIS 8427, at *6 (E.D. Pa. Feb. 1, 2010) ("Evidence that the employer

discriminated against other members of the protected class requires a showing that the other employees' situations were closely related to the plaintiff's circumstances, theory of the case and were temporally proximate." (citations omitted)).  Plaintiff will therefore be permitted to introduce into evidence Evans's deposition testimony from *Noonan* in which she discusses her comments to management about the racial composition of the news team.  Because the situation is not temporally proximate, however, and any other similarities between the two actions are less compelling, Plaintiff will not be permitted to offer any other evidence regarding *Noonan*, including the fact that it was an employment discrimination lawsuit brought against the Station by a white employee.  The probative value of such evidence does not outweigh the unfair prejudice and delay that would result if this evidence were admitted.  Accordingly, Defendants' Motion to exclude reference to the *Noonan* action will be denied.

### H.     Plaintiff's Motion *in Limine* to Exclude Evidence of His Termination from WHTM in 1999 and 2003 Lawsuit against WHTM (ECF Nos. 34, 35, 84)[12]

Plaintiff seeks to exclude from trial evidence of his termination from Harrisburg Television, Inc. (d/b/a WHTM-TV) ("WHTM") in 1999, and his subsequent lawsuit against WHTM in 2003.  Prior to working for Defendants, Plaintiff was television reporter and anchor for WHTM.  (Pl.'s Mot. 1, ECF No. 34.)  Pursuant to a contract entered into on July 12, 1999 between Plaintiff and WHTM, Plaintiff was to provide services to WHTM for the period June 1, 1998 to May 31, 2001.  (*Id*.)  The contract contained a provision permitting WHTM to "accelerate the expiration of this Agreement by giving [Plaintiff] written notice on or before September 1, 1999." (*Id*. at Ex. A.)  On September 3, 1999, WHTM informed Plaintiff that his

---

[12] Plaintiff originally filed the instant Motion *in Limine* on November 30, 2010.  (ECF Nos. 34, 35.)  Defendants filed a Response to the Motion on December 14, 2010.  (ECF No. 43.) After the stay was lifted, and the matter was scheduled to proceed to trial, Plaintiff filed a supplemental Motion *in Limine* on April 15, 2015.  (ECF No. 84), to which Defendants filed a Response on April 29, 2015 (ECF No. 100).

employment with WHTM was terminated, and that the station was electing to accelerate the expiration of Plaintiff's contract. On March 3, 2003, Plaintiff filed a lawsuit against WHTM, in the Court of Common Pleas of Dauphin County, Pennsylvania. (Pl.'s Mot. 2, ECF No. 35.) Plaintiff asserted claims for fraud and breach of contract, and alleged that WHTH failed to give him proper notice of termination under the contract. (*Id*.) The case ultimately settled in May 2010. (Defs.' Resp. 5, ECF No. 43.)

Plaintiff contends that his termination from WHTM and subsequent lawsuit against WHTM are inadmissible because the evidence is irrelevant to this case, and because any minimal probative value is substantially outweighed by its prejudicial effect. The parties do not dispute that Plaintiff was qualified for the position at Fox 29 News prior to being terminated. Therefore, Plaintiff's past work performance is not relevant to the issues presented in this case. In addition, absent from the record is the reason why Plaintiff was terminated from WHTM. There has been no indication, let alone substantive proof, that Plaintiff's termination was related to his performance. What we do know about Plaintiff's termination from, and subsequent lawsuit against, WHTM, is that the circumstances surrounding Plaintiff's prior employment appear to be wholly unrelated to the matters at issue in this case.

The evidence is also highly prejudicial under Rule 403. It would support an inference that Plaintiff is a problem employee, and that Defendants were justified in terminating him, as other employers had done so in the past. The risk of juror confusion is high. Defendants assert that the evidence surrounding Plaintiff's termination from WHTM and the lawsuit against WHTM is

> directly probative of Plaintiff's self image and his apparent notion that he can do no wrong but is somehow always the victim of unfair treatment. Plaintiff's attitudes about himself and his prior employment experiences are directly relevant to his claims in this case—that his use of the word 'n-gg-r' in a newsroom

> meeting was not inappropriate, that he was merely expressing an opinion as a
> journalist, and that he was treated adversely only because of his race. This is not
> a typical case where the danger of the jury perceiving the plaintiff as a
> 'disgruntled employee' should preclude evidence of prior suits. Here, Plaintiff's
> prior lawsuit against an employer is probative of his approach to employment, his
> arrogance in the workplace, and the apparent 'victim complex' that likely
> contributed to his suit against Defendants.

(Defs.' Reps. 7-8.) This excerpt from Defendants' Response illustrates the very reason why the

evidence at issue is too prejudicial. Defendants reveal their intent to use the WHTM evidence to

commit a character assassination against Plaintiff, which is an improper use of the evidence, and

has nothing to do with the issues in this case, including most importantly, the reason Plaintiff

was terminated from Fox. Defendants' argument further supports our finding that the risk of

prejudice substantially outweighs any probative value that the WHTM evidence may have.

Defendants also argue that the evidence is relevant to support their after-acquired

evidence defense. The Supreme Court has determined that an employer may limit damages for

violations of Title VII with evidence of the employee's wrongdoing acquired after his or her

termination. *McKennon v. Nashville Banner Publ'g. Co*., 513 U.S. 352, 359-62 (1995); *see also*

*Mardell v. Harleysville Life Ins. Co*., 65 F.3d 1072, 1073 (3d Cir. 1995). However, "[w]here an

employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that

the wrongdoing was of such a severity that the employee in fact would have been terminated on

those grounds alone if the employer had known of it at the time of the discharge." *McKennon*,

513 U.S. at 362-63. Defendants claim that Plaintiff's termination from WHTM, and subsequent

omission of this fact from his employment application with Defendants, is relevant because had

they known about it during Plaintiff's tenure, they "may" have terminated his employment.

(Defs.' Resp. 3.) Defendants point to the fact that Plaintiff intentionally omitted from his

application for employment and accompanying resume his reasons for leaving WHTM, which

was a violation of Fox's policy and standards of conduct. (*Id*.) Fox's Standards of Conduct states that "impermissible conduct," which may "lead to disciplinary action," includes "falsifying or making a material omission on a document submitted to the Company, including but not limited to an employment application, resume . . . ." (*Id*. & Ex. D.)

The after-acquired evidence defense does not support the admissibility of this evidence. First, Defendants have failed to establish that Plaintiff's termination from WHTM, or omission of this termination from his application for the position with Defendants, "was of such a severity that [Plaintiff] in fact would have been terminated on those grounds." *McKennon*, 513 U.S. at 362-63. We do not know the reason for Plaintiff's termination from WHTM. It may have nothing to do with misconduct or wrongdoing. Under the circumstances, this termination cannot rise to the level of "misconduct" as contemplated by the after-acquired evidence defense. In addition, the fact that Plaintiff failed to state the reasons for leaving WHTM on his employment application may have been a basis for "discipline" under Fox's Standards of Conduct, but there has been no showing that the discipline would have included Plaintiff's termination. Defendants submitted no affidavits or declarations by Fox agents stating that Plaintiff's conduct in omitting this information from his employment application would have constituted a violation of Fox's Standards of Conduct, and would have ultimately led to the termination of his employment. *See Nesselrotte v. Allegheny Energy, Inc*., 615 F. Supp. 2d 397, 406 (W.D. Pa. 2009) (relying on statements made in affidavits that the employee's conduct was considered a violation of policy, and would have resulted in a recommendation that the employee be terminated immediately). Instead, Defendants merely state that "[h]ad Fox 29 learned during the term of Plaintiff's employment at Fox 29 that he had been terminated by a prior employer and that he had concealed this fact from Defendants . . . the Station *may* have terminated him. (Defs.' Resp. 3

(emphasis added).)  In their supplemental brief, Defendants contend that their use of the word "may" should not foreclose their after-acquired evidence defense; however, they again, never state definitely—either in their briefing, or by way of an affidavit or declaration—that Plaintiff's actions would have resulted in his termination.

Defendants also argue that evidence of Plaintiff's termination from WHTM is relevant to Plaintiff's employability as a television news anchor/reporter, and therefore relates to his claimed damages.  (*Id*. at 3.)  Specifically, Defendants contend that "the fact that a prior employer chose to take Plaintiff off the air and terminate his contract a year and a half early is evidence that he was not the best TV news reporter to begin with, and his inability to find a job in broadcasting was the result, at least in part, of his own inability and not the incident at Fox 29."  (*Id*.) Defendant's argument is pure speculation.   Nowhere in the record is there any evidence that Plaintiff's termination from WHTM was performance-based.  Any argument that Plaintiff's termination contributed to his inability to find a job in the television news industry would be merely conjecture, and result in prejudice to Plaintiff.

Defendants' arguments with respect to the relevance of the WHTM lawsuit are similarly unavailing.  Defendants argue that the lawsuit is relevant to damages that Plaintiff is claiming in this matter.  Specifically, Defendants claim that because Plaintiff seeks emotional damages in this matter, the WHTM lawsuit is relevant because it could be a source of Plaintiff's emotional distress.  Again, this is pure speculation.  We note that Plaintiff did not seek emotional damages in the WHTM lawsuit.  Defendants also argue that the lawsuit is relevant to Plaintiff's familiarity with employment contracts with news stations because both involved employment contracts.  We fail to see how Plaintiff's familiarity with employment contracts in the broadcasting industry is at

all probative of the issues presented in this case.  Plaintiff's Motion to exclude evidence of his termination from WHTM, and subsequent lawsuit against WHTM will be granted.

### I.  Plaintiff's Motion *in Limine* To Preclude Evidence Of Plaintiff's Lawsuit Against Daily News (ECF No. 86)[13]

Finally, Plaintiff seeks to exclude evidence of his Chester County lawsuit.  That lawsuit involved an article published by the Daily News on July 5, 2007, regarding Plaintiff's suspension from Fox.  In 2008, Plaintiff filed the action in the Chester County Court of Common Pleas against the Daily News and the author of the article, Dan Gross.  Plaintiff asserted claims for intentional defamation, negligent defamation, and false light invasion of privacy.  *See Burlington v. News Corp.*, No. 09-1908, 2015 U.S. Dist. LEXIS 58348, at *1-2 (E.D. Pa. May 4, 2015).  The factual allegations and the damages claimed in the Chester County matter are very similar to, if not the same as, the factual allegations and damages claimed in this case.  The Chester County case was settled in 2013.[14]

Plaintiff argues that the Chester County lawsuit is not relevant to this case, pointing to the fact that the claims in that case—defamation and invasion of privacy—are different from the claims asserted against Defendants here—discrimination.  Plaintiff also contends that whatever probative value that the Chester County Matter has is substantially outweighed by the danger of unfair prejudice under Rule 403.  Finally, Plaintiff contends that permitting evidence of the Chester County lawsuit, and allowing the jury to infer that Plaintiff has already been compensated for this incident, would violate the collateral source rule.

---

[13] Plaintiff filed the instant Motion *in Limine* on April 15, 2015.  Defendants filed a Response to the Motion on April 29, 2015.  (ECF No. 99.)

[14]  As part of the settlement, Plaintiff and the Daily News Defendants agreed that the terms of the settlement agreement, including the settlement amount, would remain confidential. On May 4, 2015, we denied Defendants motion to compel Plaintiff to produce a copy of this settlement agreement.  (ECF Nos. 102, 103.)

The Chester County lawsuit and this case arose from the same events, involve the same witnesses, and allege the same types of damages. In the Chester County case, Plaintiff sought compensatory and punitive damages, as he does in this case. In the Chester County case, Plaintiff alleged:

> As a result of Defendant's false and defamatory statements and implications, Plaintiff's reputation has been damaged, and he has suffered economic loss, humiliation, embarrassment, mental anguish and suffering and loss of standing in the community and in his profession."

(Defs.' Mot. Ex. 2 (Chester Cnty. Compl.) at ¶ 48.) Plaintiff also alleged that he was:

> entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory publication.

(*Id*. at ¶ 56.) In his case against Fox, Plaintiff alleges:

> As a direct and proximate result of the discriminatory and retaliatory conduct of Defendants, Plaintiff has in the past incurred, and may in the future incur, a loss earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

(Def.'s Mot. Ex. 1 (Fox Compl.); *see also* Compl. ¶ 55.) Many of the categories of damages claimed in these lawsuits overlap. Plaintiff was deposed during the Chester County lawsuit. In that deposition, Plaintiff blamed the defendants in the Chester County lawsuit for his destroyed reputation, and for the professional and emotional damages he incurred. (Defs.' Mot. 5 & Ex. 3.) To the extent that Plaintiff claims at this trial that the Fox Defendants are responsible for these same damages, Defendants should be able to impeach Plaintiff with the prior statements he made in the Chester County lawsuit. Plaintiff's testimony from the Chester County lawsuit is clearly relevant to the damages he claims in this case. *See Otto v. Commerce St. Capital*, No. 12-2472, 2013 U.S. Dist. LEXIS 75572, at *9 (E.D. Pa. May 29, 2013) (permitting defendants to admit

evidence of the plaintiffs other lawsuits where the plaintiff alleged similar damages).  His prior

testimony is also permitted by the Rules of Evidence.  *See* Fed. R. Evid. 801(d).[15]  Defendants

may not, however, use the evidence from the Chester County lawsuit for an improper purpose,

such as to argue that Plaintiff has a propensity for filing lawsuits.  *See Otto*, 2013 U.S. Dist.

LEXIS 75572, at *9.

The relevance of the Chester County lawsuit becomes clear when one reviews the

background sections of the complaints in these two actions.  They are nearly identical.

(*Compare* Fox Compl. ¶¶ 26-43, 46, *with* Chester Cnty. Compl. ¶¶ 13-28, 40-43, 44.)  The

following are a few examples of identical allegations from these two complaints.  In Paragraphs

26-31 of the Fox Complaint, Plaintiff alleges:

26.   On or about June 23, 2007, Plaintiff attended a regularly scheduled newsroom editorial meeting with approximately eight (8) other employees, including reporters, producers and writers, to discuss that evening's broadcast. During the meeting, Robin Taylor (white), Reporter, discussed a story that she was planning to present during that evening's broadcast concerning a ceremony conducted by a local youth council of the National Association of the Advancement of Colored People ("NAACP") to symbolically bury the word "nigger" and its negative connotations.  During her presentation, Ms. Taylor used the euphemistic phrase "the n-word" rather than the actual word.

27.   Plaintiff expressed his opinion that using the phrase the "n-word" rather than the actual word "nigger" ultimately gives the word itself more power. Ms. Taylor responded that she personally did not feel that it was appropriate to use the word "nigger" and that she would not do so during her broadcast presentation.

28.   While Plaintiff was speaking, he noticed that Nicole Wolfe (black), Newscast Producer, seemed uncomfortable with his comments.  Immediately after the meeting ended, Plaintiff approached Ms. Wolfe and apologized if he had offended her with his comments.

29.   Approximately one hour after the meeting ended, Joyce Evans (black), Weekend Anchor/Reporter, told Plaintiff that he had offended people

---

[15] Defendants may use the prior statements from any witness who testified in the Chester County lawsuit, so long as that testimony is permitted by the Rules of Evidence.

with the word that he used.  Ms. Evans was not present at the editorial meeting and was not privy to the discussion that Plaintiff had with Ms. Wolfe.

30.  Plaintiff immediately spoke to each employee individually who was at the meeting to determine whether they were offended by his comments and to apologize.  Ms. Wolfe was the only attendee who stated that she was offended because she did not believe that there was ever a time or place or context for the word "nigger" to be stated.  Plaintiff again apologized to Ms. Wolfe and stated that he had no idea that she had this feeling about using the word "nigger" in an editorial setting.  While none of the other attendees expressed concern or offense, Plaintiff did apologize to each of them individually.

31.  When he spoke with each meeting attendee, Plaintiff also explained the thought process behind his comments and his opinion.  Plaintiff expressed his opinion that using the euphemism "the n-word" was not appropriate because it conveyed a shying away from the main point of the story and ultimately gave the word more power, which directly contradicted the point of the story.  Plaintiff said that if they were going to reference the word "nigger," they should call it a racial slur or racial epithet rather than using the phrase "the n-word."  He stated that he did not in any way intend his use of the word to be offensive, but intended to use it in such a way that he felt to be constructive and relevant to the discussion of how this word should be presented in the news broadcast.

32.  Following his conversations with the employees, Plaintiff informed Ms. Evans that he had spoken with each attendee (with the exception of one Assignment Desk Manager who had left the office before Plaintiff could speak with her) and thanked her for bringing the issue to his attention.

33.  Ms. Evans told Plaintiff that he did not "get it" regarding the use of the word "nigger."  She informed him that since he was not black, he could never know what it was like to be called a "nigger."  Evans also stated that the word "nigger" was offensive in any context and that because Plaintiff was white, he was never permitted to use that word.  Ms. Evans used the word "nigger" twice during that conversation.

(Fox Compl. ¶¶ 26-31.)  Plaintiff made nearly identical allegations in Paragraphs 13-20 in his

complaint against the Daily News and Gross in Chester County:

13.  On or about June 23, 2007, Plaintiff attended a newsroom editorial meeting with approximately eight other employees of Fox 20, including reporters, producers and writers, to discuss that evening's broadcast.

14.  During the course of the editorial meeting, Robyn Taylor, Reporter, discussed the story she was planning to present on that evening's broadcast concerning a ceremony conducted by a local youth council of the National

Association for the Advancement of Colored People ("NAACP") to symbolically bury the word "nigger," and the negative connotations that follow it. In presenting her story in the meeting, Ms. Taylor never actually said the word "nigger" but instead kept using the euphemistic phrase: "the n-word."

15. During the editorial meeting, Plaintiff expressed his opinion that using the phrase "the n-word" instead of the actual word "nigger" in presenting the story ultimately gives the word itself more power. Ms. Taylor responded that she did not feel that it was appropriate to say the actual word ["nigger"] and she would refrain from doing so in the broadcast of her story.

16. While Plaintiff was speaking, he noticed that Nicole Wolfe, Newscast Producer, who is African American, seemed uncomfortable with his comments, despite the editorial context of the discussion. After the meeting ended, Plaintiff immediately approached Ms. Wolf and apologized if he had offended her with his comments.

17. Approximately one hour after the meeting ended, Joyce Evans, Weekend Anchor/Reporter, who is also African American, approached Plaintiff and alleged that he had offended some people with the word he used. Ms. Evans was not present at the editorial meeting and was not privy to the discussion that Plaintiff had with Ms. Wolfe.

18. Plaintiff immediately spoke with each employee individually who was at the meeting to determine whether they were offended by Plaintiff's comment and to apologize. Ms. Wolfe was the only attendee who stated that she was offended because she does not believe there is ever a time or place or context for the word nigger to be stated. Plaintiff again apologized to Ms. Wolfe and stated that he had no idea she had this feeling about using the word "nigger" in an editorial setting. While none of the other attendees expressed concern or offense, Plaintiff did apologize to the attendees individually. Plaintiff also explained the thought process behind his comments and his opinion. Plaintiff expressed his opinion that using the euphemism "the n-word" isn't appropriate because it conveys a shying away from the main point of the story and ultimately gives the word more power, which directly contradicts the point of the story. Plaintiff said that if they were going to reference the word "nigger," they should call it a racial slur or a racial epithet rather than using the phrase "the n-word." Plaintiff stated that he did not in any way intend his use of the word to be offensive, but intended to use it in such a way that he felt to be constructive and relevant to the discussion of how this word should be presented in the news broadcast.

19. After Plaintiff spoke with each attendee (with the exception of one assignment desk manager who left the office before Plaintiff could speak with her), he thanked Ms. Evans for bringing the issue to his attention and informed her that he had apologized to those in the meeting.

20. Ms. Evans responded that Plaintiff did not "get it" regarding the use of the word "nigger." She said that since Plaintiff was not black, he could never know what it's like to be called a "nigger." Ms. Evans also stated that the word "nigger" was offensive in any context because it has been used historically to offend black people and that because Plaintiff was white, he was never permitted to use that word. Ms. Evans used the word "nigger" twice during the conversation.

(Chester Cnty. Compl. ¶¶ 13-20.) Even though Plaintiff asserted different causes of actions in these two complaints, the factual allegations made to support those causes of action are virtually the same. Plaintiff's argument that the Chester County lawsuit is irrelevant to this matter is belied by the pleadings he filed in these actions.

We also reject Plaintiff's argument that the collateral source rule precludes use of evidence of the Chester County case. Generally, the collateral source rule "permits a tort victim to recover more than once for the same injury provided these recoveries come from different sources." *Smith v. United States*, 587 F.2d 1013, 1015 (3d Cir. 1978); *see also Ocasio v. Ollson*, 596 F. Supp. 2d 890, 904 (E.D. Pa. 2009) (stating that "payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer") (citation omitted). "The purpose of the collateral source rule is 'to avoid precluding a claimant from obtaining redress from his or her injury merely because coverage for the injury was provided by some collateral source, e.g. insurance.'" *Ocasio*, 596 F. Supp. 2d at 904 (quoting *Nigra v. Walsh*, 797 A.2d 353, 356 (Pa. Super. Ct. 2002)). Plaintiff has not provided any cases, and we are aware of none, that have applied the collateral source rule in the context Plaintiff proposes. Generally, in Title VII cases where the collateral source rule operates to exclude evidence, the types of collateral source damages that are deemed irrelevant include unemployment compensation, Social Security payments, and welfare programs. *See Maxfield v. Sinclair Int'l*, 766 F.2d 788, 793-94 (3d Cir. 1985) ("Under the collateral source rule payments under Social Security, welfare programs,

unemployment compensation and similar programs have all been treated as collateral benefits which would not ordinarily be set off against damages awarded."). Plaintiff does not seek to exclude evidence of these types of collateral source damages. Instead, Plaintiff seeks to exclude evidence that he received money—in the form of a settlement payment—from defendants in a related lawsuit, in which he alleged damages that are nearly identical. We are not persuaded that the collateral source rule applies in this context. *See Gallagher v. Pa. Liquor Control Bd.*, 883 A.2d 550, 557 (Pa. 2005) (explaining that "although evidence of a plaintiff's recovery from collateral sources is generally inadmissible . . . an exception exists if the evidence of such recovery is relevant to a material issue in the case").

We are satisfied that the probative value of this evidence substantially outweighs the danger of unfair prejudice. Any prejudice that may result from the Chester County lawsuit was brought about by Plaintiff himself. Plaintiff chose to file separate lawsuits against separate defendants in separate jurisdictions when the two cases arose from essentially the same event. We will permit Defendants to use the testimony from the prior lawsuit. If requested by Plaintiff, however, the Court will consider a limiting instruction for the jury's consideration of this evidence.

## III.  CONCLUSION

For the following reasons, Plaintiff's Motions *in limine* will be granted in part and denied in part, and Defendants' Motions *in limine* will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

*/s/ R. BARCLAY SURRICK, J.*